No. 55 December 10, 2015 431

IN THE SUPREME COURT OF THE
STATE OF OREGON

BROADWAY CAB LLC,
*Petitioner on Review,*

*v.*

EMPLOYMENT DEPARTMENT,
*Respondent on Review.*

(EAB T71262; CA A150627; SC S062715)

En Banc

On review from the Court of Appeals.*

Argued and submitted June 17, 2015.

Thomas M. Christ, Cosgrave Vergeer Kester, LLP, Portland, argued the cause for petitioner. Sean P. Ray, Barran Liebman LLP, Portland, filed the brief. With him on the brief were Thomas M. Christ, Cosgrave Vergeer Kester, and Edwin A. Harnden, Barran Liebman.

Peenesh H. Shah, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

WALTERS, J.

The decision of the Court of Appeals is affirmed.

_____
* Judicial review from Employment Department Final Order, Amrit Mann, Administrative Law Judge. 265 Or App 254, 336 P3d 12 (2014).

**WALTERS, J.**

In this case, an administrative law judge (ALJ) determined that certain taxicab drivers performed services for Broadway Cab LLC for remuneration and were not independent contractors. Therefore, the ALJ concluded, Broadway was liable for unemployment insurance taxes on the drivers' wages. The Court of Appeals agreed with the ALJ, *Broadway Cab LLC v. Employment Dept.*, 265 Or App 254, 336 P3d 12 (2014), and, for the reasons that follow, we affirm the decision of the Court of Appeals.

The statutes that govern liability for unemployment insurance taxes are found in ORS chapter 657. Under that chapter, an "employer" must pay unemployment insurance taxes on "wages" paid for "services performed." ORS 657.505(2).[1] An "employer" is an "employing unit which employs one or more individuals." ORS 657.025(1).[2] "Wages" are "all remuneration for employment." ORS 657.105(1).[3] And "employment" is "service for an employer" that is "performed for remuneration." ORS 657.030(1).[4] Thus, Oregon

_____

[1] ORS 657.505(2) provides: "An employer shall be liable for taxes on all wages paid for services performed on or after the first day of a calendar quarter."

[2] ORS 657.025(1) provides:

"As used in this chapter, unless the context requires otherwise, 'employer' means any employing unit which employs one or more individuals in an employment subject to this chapter in each of 18 separate weeks during any calendar year, or in which the employing unit's total payroll during any calendar quarter amounts to $1,000 or more."

[3] ORS 657.105(1) provides:

"As used in this chapter, unless the context requires otherwise, and subject to ORS 657.115 to 657.140, 'wages' means all remuneration for employment, including the cash value, as determined by the Director of the Employment Department under the regulations of the director, of all remuneration paid in any medium other than cash."

[4] ORS 657.030(1) provides:

"As used in this chapter, except as provided in ORS 657.035, 657.040 and 657.043 to 657.094, 'employment' means service for an employer, including service in interstate commerce, within or outside the United States, performed for remuneration or under any contract of hire, written or oral, express or implied."

We note that the 2007 version of the statute applied in this case. The statute has been amended since that time, Or Laws 2011, ch 106, § 3, but the amendment does not affect our analysis, and we therefore cite to the current version.

The terms "employ" and "employment" are defined differently for other purposes. For instance, for the purpose of minimum wage law, the term "employ"

law requires an employer to pay unemployment insurance taxes on all sums paid for services performed for the employer for remuneration. However, if the employer can establish that an individual is an independent contractor, as that term is defined in ORS 670.600, then the employer is not liable for taxes on wages paid to that individual. ORS 657.040(1).[5]

In this case, the Employment Department issued Broadway a Notice of Tax Assessment assessing unemployment insurance taxes for the first quarter of 2008 through the fourth quarter of 2009 on the earnings of certain taxicab drivers affiliated with Broadway. Broadway contested its tax liability, and, in a hearing before an ALJ, argued that the drivers performed services for the general public—the passengers for whom the drivers provided transportation and who paid the drivers for those services. Broadway took the position that the drivers were not obligated to perform services for Broadway, and that Broadway did not remunerate them for services rendered. In fact, Broadway claimed, the opposite was true: Broadway was obligated to perform services for the drivers, and the drivers paid Broadway for the services that they received. Furthermore, Broadway argued, even if it employed the drivers, they were independent contractors, and Broadway was not liable for unemployment insurance taxes on their earnings.

After the hearing, the ALJ made findings of fact, which include the following. To lawfully drive a taxicab within the City of Portland, a driver must either obtain a taxicab company permit or associate with a permitted

---

means to "suffer or permit to work." ORS 653.010(2). The Oregon Court of Appeals has held that an "economic realities test" should be used to determine whether an individual is "employed" under that definition. *Cejas Commercial Interiors, Inc. v. Torres-Lizama*, 260 Or App 87, 103, 316 P3d 389 (2013). We do not apply that test in this case.

  [5] ORS 657.040(1) provides:

    "Services performed by an individual for remuneration are deemed to be employment subject to this chapter unless and until it is shown to the satisfaction of the Director of the Employment Department that the individual is an independent contractor, as that term is defined in ORS 670.600."

We quote and discuss the definition of "independent contractor" as defined in ORS 670.600 later in this opinion.

company.[6] At the relevant time, none of Broadway's drivers had a taxicab company permit, and the city did not issue new company permits during the period in question. Broadway did have a taxicab company permit. The terms of that permit required that Broadway be capable of fulfilling requests for service from any location within the city, 24 hours per day, seven days per week. Broadway also was obligated to fulfill requests for service by virtue of contracts that it had with various other entities, including Tri-County Metropolitan Transportation District of Oregon, Portland Public Schools, and Multnomah County.

To fulfill its service obligations, Broadway contracted with individual taxicab drivers. Broadway required drivers to sign "Driver Agreements" in order to be included on Broadway's list of approved drivers. The "Driver Agreements" all contained the same material and non-negotiable provisions.[7] The agreements permitted the drivers to operate in association with Broadway and required each driver to furnish and maintain a taxicab that was on Broadway's approved vehicle list. Drivers could own their vehicles, lease vehicles from Broadway, or drive vehicles on the approved vehicle list that were owned by other approved drivers. The agreements required that all taxicabs, whether driver-owned or leased, be painted with Broadway's colors and marked with Broadway's name.

The "Driver Agreements" did not require that the drivers drive their taxicabs for a minimum number of hours, or even that they drive at all. The agreements did, however, impose limits on the maximum number of hours

---

[6] The ALJ did not make specific findings regarding the definition of a "taxicab." The ALJ did find, however, that drivers could provide airport shuttle transportation and town car services within the city with only a city-issued driver permit, and without associating with a permitted taxicab company. That finding is consistent with section 16.40.030 of the Code of the City of Portland, which defines a "taxicab" as "any vehicle that carries passengers for-hire where the destination and route traveled may be controlled by a passenger and the fare is calculated on the basis of an initial fee, distance traveled, waiting time, or any combination thereof."

[7] All drivers executed a "Driver Agreement." Drivers who owned their own vehicles or leased vehicles from Broadway also executed either a "Vehicle Agreement" or a "Vehicle Lease Agreement." We refer to the agreements collectively as "Driver Agreements."

that a driver could work. Drivers who owned or drove a driver-owned vehicle could work up to 14 hours per day, the maximum set by the city; drivers who leased vehicles from Broadway could work up to 12 hours per day.

Under the terms of the "Driver Agreements," all drivers were required to pay driver agreement fees; drivers who owned their own vehicles or who leased vehicles from Broadway also were required to pay vehicle fees.[8] The driver agreement fee was $160 per week for all drivers. The vehicle fee was $420 per week for drivers who owned their vehicles, $320 per week for vehicle owners who shared their vehicles with another driver on Broadway's approved driver list, and $290 per week for drivers who leased their vehicles from Broadway. In exchange for those fees, Broadway provided liability insurance for the taxicabs on Broadway's approved vehicle list, routine maintenance and repairs on vehicles leased from Broadway, and access to Broadway's credit and debit card processing system, its dispatch system, and its "billing, accounting, marketing, and advertising services." Drivers were required to pay the fees whether they used all, some, or even none of those services.

The drivers paid their driver agreement and vehicle fees through accounts that Broadway maintained for each driver. When drivers chose to use Broadway's credit and debit card processing services (and all drivers who accepted credit and debit card payments did so, because none of the drivers owned a separate credit and debit card machine or an account to process such payments), Broadway credited to the drivers' accounts fares that passengers paid using credit and debit cards. Broadway also credited to the drivers' accounts fares that passengers paid using accounts that the passengers maintained with Broadway or vouchers that passengers received from the agencies and other entities with which Broadway had contracts. Drivers were entitled to keep all cash fares and amounts credited to their accounts in excess of the fees that they owed Broadway. At

---

[8] Broadway does not contend that the distinction between drivers who paid only driver agreement fees and those who also paid vehicle fees is material for purposes of deciding whether the drivers' earnings are subject to unemployment insurance taxes.

the end of each week, drivers were entitled to withdraw any positive balance that remained in their accounts.

The fees that Broadway collected in 2008, including the driver agreement and vehicle fees paid by its drivers, constituted 91.5 percent of its revenue.[9] On its company website, Broadway touted itself as the city's "oldest and largest taxicab company," with "a fleet of more than 225 cars and 340 drivers."

From those facts, the ALJ determined that the drivers performed driving services for Broadway for remuneration, and that Broadway was liable for unemployment insurance taxes on the drivers' earnings. From those and additional facts set forth below, the ALJ also determined that Broadway had not demonstrated that the drivers were independent contractors and concluded that Broadway was liable for taxes on the drivers' wages.[10] Broadway appealed to the Court of Appeals, which affirmed. *Broadway Cab LLC*, 265 Or App at 256. This court allowed Broadway's petition for review. Before this court, Broadway contends, as it did in the Court of Appeals, that the ALJ erred in concluding that Broadway was liable for unemployment insurance taxes on the drivers' wages.

We review the decision of the ALJ using the same standard that we use for review of orders in contested cases. ORS 657.684.[11] Under that standard, we review

---

[9] The driver agreement and vehicle fees collected in 2008 together totaled $5,505,007. Broadway collected additional fees of $730,620 from drivers of certain specialized taxicabs, for total fees of $6,235,627. The total fees constituted 91.5 percent of Broadway's revenue.

[10] The department calculated the drivers' wages by using the sums credited to the drivers' accounts, minus the vehicle and driver agreement fees. The ALJ concluded that the department's calculation did not accurately reflect the drivers' wages, and therefore that the amount of the tax assessment was incorrect. The department filed a cross-appeal in the Court of Appeals, assigning error to the ALJ's failure to provide the department with guidance as to how to properly calculate Broadway's taxable payroll. The Court of Appeals agreed and reversed and remanded on that issue. *Broadway Cab LLC*, 265 Or App at 261-62. Broadway did not seek review of that aspect of the Court of Appeals' decision in this court, and we therefore do not consider the accuracy of the department's calculation of the wages or taxes.

[11] ORS 657.684 provides: "Judicial review of decisions under ORS 657.683 shall be as provided for review of orders in contested cases in ORS chapter 183 ***."

legal conclusions for errors of law, ORS 183.482(8)(a),[12] and factual determinations for substantial evidence, ORS 183.482(8)(c).[13] In this case, Broadway does not argue that the ALJ's factual findings are not supported by substantial evidence. Consequently, we consider the ALJ's findings and other uncontested facts in the record to determine whether the ALJ committed errors of law. ORS 183.482(7).[14]

## I. SERVICES PERFORMED FOR AN EMPLOYER FOR REMUNERATION

As noted, under ORS chapter 657, which pertains to unemployment insurance, "employers" must pay unemployment insurance taxes on "wages." An "employer" is an "employing unit which employs one or more individuals." ORS 657.025(1). "Wages" are "all remuneration for employment," ORS 657.505(2), and "employment" is "service for an employer" that is "performed for remuneration," ORS 657.030(1). Read together, those statutes require Broadway to pay unemployment insurance taxes on sums paid to drivers for services performed for Broadway for remuneration.

In this court, Broadway relies on three primary points to support its argument that its drivers did not perform services for Broadway for remuneration. First, Broadway argues, the drivers performed services only for their passengers. The drivers were not obligated to perform driving services for Broadway; they drove only when they chose to do so. Second, the relationship between Broadway

---

[12] ORS 183.482(8)(a) provides:

"The court may affirm, reverse or remand the order. If the court finds that the agency has erroneously interpreted a provision of law and that a correct interpretation compels a particular action, the court shall:

"(A) Set aside or modify the order; or

"(B) Remand the case to the agency for further action under a correct interpretation of the provision of law."

[13] ORS 183.482(8)(c) provides:

"The court shall set aside or remand the order if the court finds that the order is not supported by substantial evidence in the record. Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding."

[14] ORS 183.482(7) provides, in part: "Review of a contested case shall be confined to the record, and the court shall not substitute its judgment for that of the agency as to any issue of fact or agency discretion."

and the drivers was not an employment relationship; rather, it was a relationship in which Broadway performed services for the drivers, and the drivers paid Broadway for those services. Third, Broadway did not pay the drivers for their driving services—the passengers did.

We begin with, and accept as true, Broadway's contention that the drivers provided services for their passengers. We have more difficulty, however, with Broadway's contention that the drivers provided services for their passengers alone. The relevant statutes do not require that services provided by a putative employee be provided for the exclusive benefit of an employer, and many employees provide services that benefit both the recipients of the services, such as clients or customers, and those who employ them. *See, e.g., Journal Pub. Co. v. State U.C. Com.*, 175 Or 627, 653, 155 P2d 570 (1945) (individual newspaper distributor who supplied papers to subscribers performed services for publishing company); *Kirkpatrick v. Peet*, 247 Or 204, 213, 428 P2d 405 (1967) (door-to-door vacuum salesmen who supplied vacuums to individuals performed services for vacuum distributor). Broadway contends that the drivers in this case were different, however, because they drove only when they chose to do so and not out of any legal obligation to Broadway.

Broadway is correct that the "Driver Agreements" did not explicitly require the drivers to provide driving services for Broadway. However, the agreements were premised on an assumption that the drivers would do so. The drivers were not permitted to drive taxicabs in the City of Portland unless they had a taxicab company permit or associated with a permitted company. The drivers did not have taxicab company permits, so the "Driver Agreements" provided the necessary authorization. The taxicabs that the drivers operated, whether driver-owned or leased, were marked with Broadway's colors and name. All drivers, including those who owned their own vehicles, were required to pay substantial fees; in 2008 those fees averaged $24,453 per driver.[15] Those fees were due whether or not the drivers

---

[15] This figure is derived from a document that Broadway submitted in the administrative hearing entitled "2008 Summary of Revenue Transactions." That

performed driving services, but it was only when the drivers performed driving services for Broadway that they earned the sums that were necessary to pay them. Thus, although the "Driver Agreements" did not explicitly require the drivers to provide driving services, and although the drivers controlled the number of hours they drove, the drivers could not fulfill their financial obligations to Broadway without driving for Broadway for a significant number of hours. The reality of the parties' agreement, therefore, was that the drivers would "perform" driving "services" for Broadway within the meaning of ORS 657.030(1).

We turn next to Broadway's argument that its arrangement with its drivers was not an employer/employee relationship, but rather a provider/purchaser relationship. As Broadway describes it, Broadway provided services to the drivers, and the drivers purchased those services for a fee. Such a relationship, Broadway asserts, is akin to the space-sharing relationship that this court considered in *Golden Shear Barber Shop v. Morgan*, 258 Or 105, 481 P2d 624 (1971). In that case, a barber shop apprentice paid the proprietor a weekly fee that went into a fund used only for "[s]hop expenses, or alterations and additions agreed to by the barbers," *id.* at 107 n 1, and none of the barbers in the shop, including the proprietor, could profit from the contributions to that common fund, *id.* at 112. The court concluded from those facts that the parties had not entered into an employment relationship; instead, they had negotiated a bona fide space-sharing arrangement, and the proprietor was not liable for unemployment insurance taxes. *Id.* at 112-13.

The facts in this case are significantly different. Although Broadway is correct that it provided certain administrative services and that the drivers paid fees in consideration for those services, that exchange of services for fees was not the only way in which the parties benefitted from their contractual relationship. The "Driver Agreements"

---

document shows that in 2008, Broadway received $2,468,307 in driver agreement fees, $1,561,736 in vehicle fees from drivers who leased their vehicles, and $1,474,963 in vehicle fees from drivers who owned their vehicles. Broadway also received an additional $730,620 in fees from drivers of certain specialized taxicabs. Broadway had 255 drivers in 2008. To calculate the average amount paid in fees, we divided Broadway's total fee revenue by the total number of drivers.

enabled Broadway to fulfill its obligations to the city and other public entities, and they enabled the drivers to drive taxicabs within the city.

Moreover, unlike the proprietor in *Golden Shear Barber Shop*, Broadway did not establish that the weekly fees that drivers paid covered only the cost of the services that Broadway provided. Broadway did not adduce evidence of the cost of providing the required services or demonstrate that its fees bore a relationship to the value of the services that the drivers actually used. Drivers were not required to use Broadway's administrative services, such as its dispatch or credit and debit card processing services, and there was no showing that drivers who took greater advantage of those services paid more in fees than did those who used the services to a lesser extent or not at all. Drivers who owned their own vehicles paid a higher weekly vehicle fee ($420, or $320 if the driver permitted another approved driver to drive his or her vehicle) than did drivers who leased vehicles from Broadway ($290). Broadway did not establish that its relationship with its drivers was solely a provider/purchaser relationship.

Finally, we consider and reject Broadway's argument that because the passengers, and not Broadway, paid the drivers for their services, the drivers did not provide services for Broadway for remuneration. In making that argument, Broadway seems to assume that, to constitute "wages" subject to unemployment insurance taxes, payments for services must come directly from the putative employer. Broadway is incorrect in that assumption; the text of the relevant statutes does not impose that requirement. "Wages" are "all remuneration for employment," ORS 657.105(1), and "employment" means "service for an employer" that is "performed for remuneration." ORS 657.030(1). Neither statute requires that the putative employer pay the putative employee directly for services provided, and this court has declined to read such a requirement into the statute. *Journal Pub. Co.*, 175 Or at 659; *see also Columbia Management Co. v. Morgan*, 270 Or 109, 119, 526 P2d 571 (1974) (employment relationship may exist "even though the wages of such an individual are paid by someone else, either directly or indirectly").

This court's decision in *Journal Pub. Co.* is effectively on point. In that case, this court considered whether a newspaper publisher was liable for unemployment insurance taxes based on the earnings of an individual distributor. *Journal Pub. Co.*, 175 Or at 630. The publisher sold its papers to the distributor, who then resold the papers to subscribers. *Id.* at 635. The distributor's earnings were the difference between the wholesale and retail price of the papers. *Id.* at 635-36. The court held that, even though the subscribers, and not the publisher, paid the distributor the retail price of the papers, the distributor received remuneration for his services. *Id.* at 660. In reaching that conclusion, the court found guidance in an Iowa case that concerned taxicab drivers. *Id.* at 655. In the Iowa case, certain taxicab drivers paid the putative employer $3.00 for each 12-hour period they worked, and then retained, as their compensation, all sums that they collected from passengers in excess of that fee and the cost of the gasoline that the drivers furnished. *Id.* The Iowa court concluded that the drivers' net earnings were "remuneration of wages for their services" under Iowa law. *Id.* at 656. In *Journal Pub. Co.*, this court quoted with approval the Iowa court's determination that "[i]t is not required that the remuneration be paid by the employer." *Id.*

Broadway does not address the holding in *Journal Pub. Co.* or offer any reason to question it, and we adhere to it. The fact that the drivers received fares from their passengers does not mean that the drivers did not provide services for Broadway or receive remuneration for those services. We conclude that the ALJ did not commit legal error in concluding that Broadway employed the drivers.

## II.   INDEPENDENT CONTRACTOR EXCLUSION

Broadway next argues that, even if Broadway had an employment relationship with its drivers, it was not required to pay unemployment insurance taxes on wages paid to those drivers because they were independent contractors. ORS 657.040(1) provides:

> "Services performed by an individual for remuneration are deemed to be employment subject to [the unemployment insurance] chapter unless and until it is shown to

the satisfaction of the *** Employment Department that the individual is an independent contractor, as that term is defined in ORS 670.600."

Under ORS 670.600(2), an "independent contractor" is "a person who provides services for remuneration and who, in the provision of the services:"

"(a)   Is free from direction and control over the means and manner of providing the services, subject only to the right of the person for whom the services are provided to specify the desired results;

"(b)   *** [I]s customarily engaged in an independently established business;

"(c)   Is licensed under ORS chapter 671 or 701 if the person provides services for which a license is required under ORS chapter 671 or 701; *and*

"(d)   Is responsible for obtaining other licenses or certificates necessary to provide the services."

(Emphasis added.) Because the elements are conjunctive, it is Broadway's burden to establish that its drivers met the requirements of each of those four criteria. Failure to meet the requirements of any one of the criteria defeats independent contractor status for purposes of the statute.

In this case, the ALJ concluded that Broadway's drivers were not independent contractors because Broadway failed to demonstrate three of the four criteria: under paragraph (a), that the drivers were free from Broadway's direction and control; under paragraph (b), that the drivers were customarily engaged in an independently established business; and under paragraph (d), that the drivers were responsible for obtaining other licenses or certificates necessary to provide the services. The ALJ found that the fourth criterion, specified in paragraph (c), did not apply, because the drivers provided services for which a license was not required under ORS chapter 671 or 701. The Court of Appeals affirmed, but focused solely on Broadway's failure to demonstrate one of the required criteria—the requirement of paragraph (b) that the drivers "were customarily engaged in an independently established business." *Broadway Cab LLC*, 265 Or App at 268.

A person is "customarily engaged in an independently established business if any three of the following [five] requirements are met:"

"(a)   The person maintains a business location:

"(A)   That is separate from the business or work location of the person for whom the services are provided; or

"(B)   That is in a portion of the person's residence and that portion is used primarily for the business.

"(b)   The person bears the risk of loss related to the business or the provision of services \* \* \*[.]

"(c)   The person provides contracted services for two or more different persons within a 12-month period, or the person routinely engages in business advertising, solicitation or other marketing efforts reasonably calculated to obtain new contracts to provide similar services.

"(d)   The person makes a significant investment in the business \* \* \*[.]

"(e)   The person has the authority to hire other persons to provide or to assist in providing the services and has the authority to fire those persons."

ORS 670.600(3). The ALJ determined that Broadway's drivers failed to meet four of those five criteria: under paragraph (a), that they maintained business locations separate from Broadway or in a portion of their residences; under paragraph (c), that they provided contracted services for two or more persons within a 12-month period or routinely engaged in business advertising; under paragraph (d), that they made a significant investment in the business; and, under paragraph (e), that they had the authority to hire and fire other persons to provide or assist in providing the services.

On appeal to the Court of Appeals, Broadway argued that the ALJ had erred in its analysis of all four of those criteria. In affirming the ALJ's decision, the Court of Appeals relied on Broadway's failure to meet three of the five criteria. The court reasoned that if the uncontested facts demonstrated that Broadway did not meet three of the five statutory criteria, then, by process of elimination, Broadway could meet only two of the required three criteria. *Broadway*

*Cab LLC*, 265 Or App at 268-69. The court concluded that the uncontested facts demonstrated that Broadway's drivers did not, under paragraph (a), maintain business locations separate from Broadway or in a portion of their residences; under paragraph (c), provide contracted services for two or more persons within a 12-month period or routinely engage in business advertising; and, under paragraph (e), have the authority to hire and fire other persons to provide or to assist in providing the services. *Id*. at 269.

On review before this court, Broadway does not argue that its drivers met the criteria specified in paragraph (c),[16] or, under subparagraph (a)(B), that its drivers maintained business locations in a portion of their residences.[17] Thus, we focus on whether the uncontested facts demonstrated that, as required by subparagraph (a)(A), the drivers maintained business locations separate from Broadway, and, as required by paragraph (e), had the authority to hire and fire other persons to provide or assist in providing the services. We consider those provisions in turn.

A.    *Separate business location*

Broadway argues that its drivers met the requirements of subparagraph (a)(A) of ORS 670.600(3) because a taxicab operator's work "location" is his or her vehicle. The department responds that vehicles are not "locations," because that term refers to a physical area typically recognizable as real property and fit for occupancy. And, the department asserts, even if the word "location" is ambiguous, the vehicles were not "separate" from Broadway, because they were always either physically in Broadway's possession or in use in furtherance of Broadway's business.

---

[16] Paragraph (c) requires that the person either provide contracted services for two or more different persons within a 12-month period or routinely engage in business advertising. In its brief in this court, Broadway does not contend that either requirement was met.

[17] In a footnote in its brief, Broadway asserts that "[s]ome operators testified that they also maintain fully functioning home offices or at least have devoted particular space in their homes for a desk, a computer, a file cabinet, and other standard equipment one could be expected to find in such an office." However, Broadway makes no argument that those facts are sufficient to establish that those drivers maintained a business location in a portion of their residence and used that portion primarily for the business.

In our view, the department's final point is persuasive. To determine whether Broadway's drivers "maintain[ed] a business location" that was "separate" from Broadway's business location, ORS 670.600(3)(a)(A), we must consider not only the location of the drivers' businesses, but also the location of Broadway's business. As we explained above, Broadway's business was not limited to providing administrative services; Broadway's business was to provide taxicab services throughout the City of Portland. Broadway operated that business by employing individual taxicab drivers who drove their vehicles throughout the city. It follows that Broadway's business was located not only at its administrative offices, where its administrative functions were performed, but also in the field, where its taxicabs were operating. Thus, even if the drivers' businesses were located in their taxicabs, those vehicles were not "separate from the business or work location of [Broadway]." *Id*.

B.   *Authority to hire and fire*

To satisfy the criterion set out in paragraph (e) of ORS 670.600(3), Broadway was required to establish that its drivers "ha[d] the authority to hire other persons to provide or to assist in providing the services and ha[d] the authority to fire those persons." Broadway argues that its drivers met the requirements of paragraph (e) because Broadway did not restrict the drivers' ability to hire their own employees and sub-contractors to assist in the operation of the drivers' taxicab businesses. Therefore, Broadway contends, its drivers had authority to hire and fire "persons to provide or to assist in providing the services." *Id*. The referenced services, Broadway asserts, are those services necessary to the drivers' businesses. On that point, the department disagrees. It argues that "the services" to which paragraph (e) refers are the services that a person provides to the employer—in this case, the driving services that the taxicab drivers provided to Broadway—and that the drivers did not have authority to hire other persons to provide driving services in the drivers' stead.

We agree with the department. A person who provides services for an employer for remuneration is in an employment relationship with the employer *unless* the person is an

independent contractor under ORS 670.600. ORS 657.040(1). Under ORS 670.600(2)(b), an "independent contractor" is "a person who provides *services for remuneration* and who, *in the provision of the services* \*\*\* is customarily engaged in an independently established business." (Emphasis added.) Thus, the task at hand is to determine whether a person who provides certain services for an employer is providing those services as an employee or as an independent contractor. One of the indicators that a person is an independent contractor is that the person has the authority to hire "other persons to provide or to assist in providing *the services.*" ORS 670.600(3)(e) (emphasis added). The services to which paragraph (e) refers can only be the services that are the subject of the inquiry and to which ORS 670.600(2) refers—the services that the person provides to the employer for remuneration. In this case, those services are the driving services that the drivers provided to Broadway.

Therefore, the question presented is whether the drivers had authority to hire other persons to "provide or to assist in providing" the driving services that the drivers provided to Broadway. ORS 670.600(3)(e). That question is directly addressed by a provision of the "Driver Agreements" that precluded persons other than approved drivers who had themselves entered into "Driver Agreements" from driving vehicles on Broadway's approved vehicle list. In this court, Broadway does not contend that its drivers had authority to hire individuals to provide or assist in providing driving services, nor does Broadway argue, as it did before the ALJ, that its authority to hire other professionals provided the necessary authority. Before the ALJ, Broadway relied on a provision of the "Driver Agreements" that granted drivers the authority to hire professionals, such as mechanics, accountants, and tax professionals, to assist in their taxicab businesses. Reliance on that provision in this court would be unpersuasive. Authority to hire individuals to perform services other than driving services is not the kind of authority to which paragraph (e) refers. The relevant authority is the authority to drive, and, under the terms of the "Driver Agreements," only Broadway could decide who could drive the taxicabs on its approved vehicle list. Broadway did not establish that its drivers met the requirements of paragraph (e).

In summary, we conclude that the drivers provided services for Broadway for remuneration and that Broadway did not establish that its drivers were independent contractors. We therefore conclude that Broadway is obligated to pay unemployment insurance taxes on the wages earned by those drivers for the first quarter of 2008 through the fourth quarter of 2009.

The decision of the Court of Appeals is affirmed.