Argued and submitted May 27, 2015, affirmed June 8, petition for review
allowed December 22, 2016 (360 Or 751)
See later issue Oregon Reports

ACN OPPORTUNITY, LLC,
*Petitioner,*

*v.*

EMPLOYMENT DEPARTMENT,
*Respondent.*

Office of Administrative Hearings
T71434; A152977

377 P3d 638

William F. Gary argued the cause for appellant. With
him on the briefs were J. Aaron Landau and Harrang Long
Gary Rudnick, P.C.

Jona Jolyne Maukonen, Assistant Attorney General,
argued the cause for respondent. On the brief were Ellen

F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Karla H. Ferrall, Assistant Attorney General.

Before Sercombe, Presiding Judge, and Hadlock, Chief Judge, and Tookey, Judge.

## TOOKEY, J.

This is a review of an administrative law judge's (ALJ's) final order that affirmed a corrected amended determination issued by the Employment Department (department). In that determination, the department found that ACN Opportunity, LLC (ACN) was an employer required to pay unemployment insurance tax on earnings paid to ACN's "independent business owners" (IBOs), through whom ACN sold satellite television, telephone, internet, and home security services. On appeal, ACN argues that the ALJ's order was error because, (1) pursuant to the provisions of ORS 657.087(2), ACN established that its relationship with its IBOs was exempted from the definition of "employment," or, in the alternative, (2) ACN established that its IBOs were "independent contractors," ORS 670.600, and therefore not "employees" of ACN.[1] We affirm.

In reviewing an ALJ's final order, we review legal conclusions for errors of law and factual determinations for substantial evidence. ORS 183.482(8)(a) and (c); *Broadway Cab LLC v. Employment Dept.*, 358 Or 431, 437-38, 364 P3d 338 (2015). As ACN does not argue that the ALJ's findings were unsupported by substantial evidence, we begin our review by reciting the following facts consistent with the ALJ's findings, and, as needed, consider other uncontested facts to determine whether the ALJ committed errors of law. *Id.* at 438; *see also Avanti Press v. Employment Dept. Tax Section*, 248 Or App 450, 452, 274 P3d 190 (2012) (describing the facts consistently with the ALJ's unchallenged findings).

ACN, a subsidiary of ACN, Inc., is registered and has its principal offices in North Carolina. ACN is an authorized

---

[1] In its third assignment of error, ACN argues that the ALJ erred in excluding evidence pertinent to its claim that it was denied equal privileges and immunities under the law, pursuant to Article I, section 20, of the Oregon Constitution. We express no opinion on that challenge, except to note that it is unpreserved. *See Peeples v. Lampert*, 345 Or 209, 220, 191 P3d 637 (2008) (noting that "[p]reservation rules are pragmatic as well as prudential," and that "[w]hat is required of a party to adequately present a contention to the trial court can vary depending on the nature of the claim or argument; the touchstone in that regard, ultimately, is procedural fairness to the parties and to the trial court").

retailer of telecommunications products and services that include satellite television, internet, wireless services, digital and video telephone, local and long distance telephone, and home security. The services and products do not originate with ACN, but with various third-party national vendors. ACN enters into agreements with the vendors, and sells the vendors' products and services to customers and businesses through its network of IBOs.

During the period in issue, ACN had IBO contracts with multiple individuals in Oregon. Each individual entered into a written contract with ACN, which consisted of three documents: the ACN Independent Business Owner Agreement, ACN's Policies and Procedures, and ACN's Compensation Plan. According to the contract, an IBO would pay ACN an initial fee of $499 for a one-year license to market and sell ACN's products and services, and pay an annual renewal fee of $149 per year. In return for payment of the initial fee, each IBO received a "Team Trainer Kit," access to ACN's customer tracking services, ACN's website for submitting all customer orders, and ACN's back office and call center services. Most other "tools" for selling ACN's products and services—*viz.* computers, telephones, training assistance, and any marketing materials—were not provided by ACN, but could be purchased from ACN. IBOs could also create, for a monthly fee, a personalized distributor website at ACN's official company website.

Under the contract, ACN and the IBO agreed that the IBO would market and sell ACN's products and services as an independent contractor, and not as ACN's employee or vendor. A sole proprietorship, partnership, limited liability company or corporation could become an IBO, subject to ACN's review and approval. IBOs were free to select the means, methods, and manner of operation and to choose the hours and location of their activities, subject only to the terms of the agreement. ACN provided no direct supervision of the IBOs and the IBOs were generally free to decide where they would meet with potential customers and how much time to devote to sales activities.

ACN did limit the method by which IBOs could solicit sales of the products and services. ACN prohibited

IBOs from using "cold marketing" techniques, which ACN defined as "promotional activity geared toward random individuals who have no personal, business, social or acquaintance relationship(s) with the promoter." ACN prohibited "mass advertising, purchased leads, trade show participation, door-to-door selling, telemarketing, pamphlet distribution, etc." Sales and solicitations of ACN's products and services occurred at various public locations, such as coffee shops and hotel conference rooms, and in customer's homes and offices.

ACN provided IBOs with no office space. In order to conduct his business activities for ACN, one IBO, Maddux, testified that he used his laptop and cell phone, and worked at a desk in his home and at other locations as well, such as a coffee shop, his mother's home, or a customer's home.

Under the contract, IBOs were compensated through bonuses from a customer's initial subscription to ACN's telecommunications services and through commissions from a customer's continued use of those services. An IBO could also earn more compensation by "sponsoring" other IBOs, called "downline IBOs." According to the terms of the agreement, an IBO could receive compensation from its own customers' subscriptions and continued use of ACN's products and services, and from a downline IBO's customers' subscriptions and continued use of the products and services.

ACN put some limitations on downline IBO sponsorships. ACN prohibited a sponsoring IBO from "solicit[ing] an individual or entity that has been previously sponsored by another [IBO] or that is considering joining ACN and being sponsored by another [IBO]." ACN allowed a downline IBO to change sponsorships only if the downline IBO first resigned and then waited a year to join a different sponsor IBO. ACN also reserved the right to change a sponsorship if it "found that unethical or misleading practices were used."

IBOs promised to not, "directly or indirectly, sell or solicit customers for products or services offered by ACN through any person or entity other than that specifically designated or approved in writing by ACN."

In January 2008, the department's tax division interviewed McLaughlin, an IBO located in Oregon, regarding McLaughlin's claim for unemployment insurance benefits. This was followed by claims for unemployment insurance benefits by four other IBOs located in Oregon. The department investigated four of those claims and eventually concluded that each IBO performed services for ACN as an "employee." Accordingly, it issued a determination finding that ACN was an "employer subject to Oregon Employment Department Law as of January 1, 2010." Later, the department issued an amended determination, changing the date when ACN became an "employer" to July 1, 2007. The department also issued an assessment assessing ACN taxes and interest of $798.80.

ACN filed a request for hearing on the amended determination. A few weeks prior to the hearing, the department issued a corrected assessment and a corrected amended determination, amending the previous documents for the sole purpose of correcting ACN's name. The ALJ concluded that ACN failed to file a timely request for hearing on the corrected assessment, and limited its hearing to ACN's arguments pertaining to the corrected amended determination.

The main issue before the ALJ was whether the IBOs were "employ[ed]" by ACN, as provided in ORS 657.040(1). That statute provides:

"Services performed by an individual for remuneration are deemed to be employment subject to [the unemployment insurance] chapter unless and until it is shown to the satisfaction of the * * * Employment Department that the individual is an independent contractor, as that term is defined in ORS 670.600."

There was no dispute that the IBOs performed services for remuneration, and that ACN paid the IBOs for their services. ACN argued that its IBOs were not under ACN's "employment," because, pursuant to the provisions of ORS 657.087(2), its IBOs were exempt from the definition of employment, or, in the alternative, because ACN's IBOs were independent contractors as defined in ORS 670.600.

After a hearing, the ALJ issued its final order, concluding that ACN had failed to prove that IBOs were within the exemption provisions of ORS 657.087(2), or that its IBOs were independent contractors. Consequently, the ALJ concluded that ACN was an "employer" as of July 1, 2007, and that the services performed by the IBOs constituted taxable employment. ACN assigns error to those conclusions.

## I.  ORS 657.087(2) EXEMPTION FROM DEFINITION OF EMPLOYMENT

As already stated, for purposes of "Employment Department Law," ORS 657.005, "[s]ervices performed by an individual for remuneration are deemed to be employment[.]" ORS 657.040(1). ORS 657.087 provides certain exemptions from that rule:

> "'Employment' does not include service performed:

> "(1). By individuals soliciting contracts for home improvements including roofing, siding and alterations of private homes to the extent that the remuneration consists of commissions, or a share of the profit realized on each contract; or

> "(2)  By individuals to the extent that the compensation consists of commissions, overrides or a share of the profit realized on orders solicited or sales resulting from the in-person solicitation of orders for and making sales of consumer goods in the home."

ACN contended before the ALJ, and contends now, that its relationship with its IBOs met the criteria of ORS 657.087(2). The ALJ concluded that the IBOs' activities did not meet the criteria of ORS 657.087(2), because ACN could not establish to what extent its IBOs received compensation for "consumer goods," and could not establish to what extent its IBOs received compensation for in-person solicitations "in the home." We address only the latter contention, *viz.*, that ACN did not establish that its IBOs' compensation resulted from "in-person solicitation of orders for and making sales of consumer goods in the home."

According to the ALJ's findings of fact, the IBOs conducted sales and solicitations not only in customers'

homes, but in customers' offices and at various public locations, such as coffee shops and hotel conference rooms. In concluding that ACN had not established that its IBOs' compensation resulted from "in-person solicitation of orders for and making sales of consumer goods in the home," the ALJ relied on OAR 471-031-0125, which provides:

> "For the purposes of ORS 657.087(2), 'In-person solicitation' means a face-to-face contact at the customer's residence and does not include mail, telephone or other non-personal contacts."

The ALJ concluded that OAR 471-031-0125 "clearly and unambiguously requires face-to-face contact in the customer's home as a condition of exclusion under ORS 657.087(2)[.]" Furthermore, the ALJ concluded, "although it appears that some of the sales resulted from face-to-face contacts in customer homes, [ACN] failed to show to what extent this occurred."

Thus, the ALJ determined that ACN had not established that its IBOs' services qualified for the ORS 657.087(2) exemption from "employment" because it had not established "the extent" to which the IBOs' compensation resulted from in-home sales.

In challenging the ALJ's conclusion on that point, ACN argues that its IBOs met the requirements of ORS 657.087(2) as long as its sales and solicitations occurred primarily "in the home." However, ACN does not point to anything in the statutory text that would support its contention. The plain text of the statute applies to services performed by individuals "*to the extent that* [their] compensation consists of" certain sums "on orders solicited or sales resulting from the in-person solicitation of orders for and making sales of consumer goods *in the home.*" ORS 657.087(2) (emphasis added). Thus, the statute exempts from the definition of "employment" commissions and other earnings precisely "to the extent" they result from in-home sales. We would be expanding the scope of the statute if we interpreted it to mean, as ACN urges, that it applies to IBOs' compensation that results *primarily* from in-home sales. We cannot read the term "primarily" into the statute, as ACN requests. ORS 174.010 (in interpreting a statute, a court's role is "not to insert what has been omitted,"

but "simply to ascertain and declare what is, in terms or in substance, contained therein").[2]

Rather than relying on anything in the statute's text or context, ACN essentially makes a policy argument, asserting that the legislature cannot have meant the statute to apply only to the extent that individuals' compensation results from in-home sales, because that would undermine certain business models. That policy argument stands on shaky ground, as it is divorced from statutory text or context.

However, ACN insists that, regardless of its text, ORS 657.087(2)'s legislative history indicates that the statute was enacted specifically to exempt direct-selling businesses such as ACN from the definition of "employment." We agree that, in this case, a consideration of the legislative history greatly assists us in determining the legislature's intent, *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009) (the court will consult legislative history to the extent that it appears useful to the court's analysis); however, it leads us to conclude that the statute does not exempt ACN's relationship with its IBOs from the definition of employment.

Subsection (2) of ORS 657.087 was added in 1977 by House Bill (HB) 2238 (1977). Or Laws 1977, ch 101, § 1. Prior to its amendment in 1977, ORS 657.087 (1975) exempted only home improvement solicitations:

> "'Employment' does not include service performed by individuals soliciting contracts for home improvements including roofing, siding and alterations of private homes to the extent that the remuneration for such services primarily consists of commissions or a share of the profit realized on each contract."

In testimony before the House Labor Committee on February 9, 1977, Representative Glen Whallon, as the sponsor of HB 2238, presented the original draft of the bill

---

[2] ACN also seems to suggest that the ALJ erroneously interpreted ORS 657.087(2) to exempt services performed by individuals only if those individuals' compensation resulted *entirely* from in-home sales. ACN misconstrues the ALJ's order, which states explicitly that ACN had failed to establish the *extent* to which the compensation resulted from in-home sales.

to the committee. Tape Recording, House Labor Committee, HB 2238, Feb 9, 1977, Tape 5, Side 2 (statement of Rep Glen Whallon). The original draft amended ORS 657.087 (1975) as follows:

> "'Employment' does not include service performed by individuals soliciting contracts for home improvements including roofing, siding and alterations of private homes **or the in-home solicitation of orders for, or making sales of, consumer goods or services** to the extent that the remuneration for such services primarily consists of commissions, **overrides** or a share of the profit realized on each contract, **order solicited or sale**."

HB 2238 (Jan 11, 1977) (amended language in boldface). Representative Whallon testified that the activities provided for in HB 2238 should be exempt in the same way that others activities, such as security sales, real estate sales, magazine sales, and home improvement solicitation, already were exempted from the definition of "employment." Tape Recording, House Labor Committee, HB 2238, Feb 9, 1977, Tape 5, Side 2 (statement of Rep Glen Whallon).

Testifying with Representative Whallon was Gene Vorhees, a Tupperware distributor in Oregon. Tape Recording, House Labor Committee, HB 2238, Feb 9, 1977, Tape 5, Side 2 (statement of Gene Vorhees). Vorhees explained that HB 2238 was intended to reverse the result of a case, *Timberland Sales v. Employment Div.*, 20 Or App 192, 199, 530 P2d 880, *rev den* (1975), in which we upheld the Oregon Employment Division's (employment division) conclusion that Tupperware dealers were not "independent contractors," but "employees" for unemployment insurance tax purposes. Tape Recording, House Labor Committee, HB 2238, Feb 9, 1977, Tape 5, Side 2 (statement of Gene Vorhees). Vorhees testified that Tupperware dealers were typically persons who sell Tupperware part time, primarily through home parties, as a means of providing additional income for a household, and the dealers' earnings were based upon the difference between "what she pays for the product and the prices for which she sells it * * * making her really an independent contractor." *Id.* Vorhees further testified that, as a result of the case, Tupperware distributors would be forced to treat their dealers as employees, which

would create a great hardship for the distributors, because of the "tremendous annual turnover" in Tupperware dealers and because a dealer is free to sell Tupperware products at any price, and so the dealer's estimated earnings would be very difficult to estimate. *Id.*

Testifying on behalf of the employment division at the February 9, 1977, committee hearing, Lee Russell stated that the employment division had "reservations in the bill," because the employment division interpreted the language "making sales * * * of consumer goods or services," to include sales occurring anywhere, including at a store, and not just sales that occurred in a home solicitation. Tape Recording, House Labor Committee, HB 2238, Feb 9, 1977, Tape 5, Side 2 (statement of Lee Russell). Russell suggested amending the new language as follows: "in-home solicitation of, and making sales **through other party-planning merchandizing** for, consumer goods or services[.]" *Id.* (proposed amendment in boldface.) Committee members expressed concern regarding the suggested language. Representative Bill Rogers asked whether there were other kinds of activities "where this same thing occurs—not just party-type" solicitations. Tape Recording, House Labor Committee, HB 2238, Feb 9, 1977, Tape 5, Side 2 (statement of Rep Bill Rogers). Representative Ted Kulongoski also wondered if the proposed amendment would only cover Tupperware dealers, asking, "Are there some in-home solicitations that for some reason are not included or are not going to be affected?" Tape Recording, House Labor Committee, HB 2238, Feb 9, 1977, Tape 5, Side 2 (statement of Rep Ted Kulongoski).

After listening to the concerns raised by Russell and the committee members, Representative Whallon responded that the purpose of the bill was meant to cover all door-to-door salespersons, as well as more than just Tupperware dealers, but not to cover sales that occur anywhere, as Russell had interpreted the bill's language. Tape Recording, House Labor Committee, HB 2238, Feb 9, 1977, Tape 5, Side 2 (statement of Rep Glen Whallon). The committee requested Representative Whallon and Russell to work together on making amendments to the bill to address the concerns. Tape Recording, House Labor Committee,

HB 2238, Feb 9, 1977, Tape 5, Side 2 (statement of Rep Ted Kulongoski). In summary, the legislative history from the February 9, 1977, committee hearing indicates that Representative Whallon and Russell were tasked with amending HB 2238's language so that (1) the exemption would apply not only to a Tupperware dealer's activities, but other businesses' in-home sale activities; (2) the exemption would apply to door-to-door solicitations; and (3) the exemption would be limited to sales occurring in the home.

On February 16, 1977, Russell again testified before the House Labor Committee, presenting the suggested amendments to the bill that Russell, W. Alan Luce of Tupperware, and Karl Frederick of Associated Oregon Industries had agreed addressed their concerns and the committee's concerns. Tape Recording, House Labor Committee, HB 2238, Feb 16, 1977, Tape 7, Side 1 (statement of Lee Russell). The amended version of HB 2238 provided:

> "'Employment does not include service performed:
>
> "(1) By individuals soliciting contracts for home improvements including roofing, siding and alterations of private homes to the extent that the remuneration consists of commissions or a share of the profit realized on each contract; or
>
> "(2) By individuals to the extent that the compensation consists of commissions, overrides or a share of the profit realized on orders solicited or sales resulting from the in-person solicitation of orders for and making sales of consumer goods **in the home**."

HB 2238 (1977) (some of the amendments' added language in boldface).

Russell explained, "Essentially, the amendments would restore the first part of [the statute] to the exact same language currently in the law," and would exempt, under both subsections, only that portion of a person's remuneration that does not come from salary. Tape Recording, House Labor Committee, HB 2238, Feb 16, 1977, Tape 7, Side 1 (statement of Lee Russell). Not explicitly stated, but evident from the additional language at the end of subsection (2), was the drafters' intent to address the employment

division's concern that the exempted activities be limited to those occurring in the home. The proposed amendments were approved and the bill was sent to the House with a "do pass" recommendation. Minutes, House Labor Committee, HB 2238, Feb 16, 1977.

The bill's original language, combined with the concerns raised at the February 9, 1977, committee hearing and the resulting amendments presented and adopted at the February 16, 1977, committee hearing, indicate that the legislature intended to create a new exemption from the term "employment," but to limit the exemption to only that portion of remuneration that was based on commissions, overrides, or shared profits, and further, to limit the exemption to the following activities: door-to-door solicitations and other face-to-face sales and solicitations that occur in a home, such as, but not limited to, the Tupperware home-party sales.

Applying the statute's criteria to ACN, we conclude that ACN failed to establish to what extent its IBOs activities consisted of such face-to-face solicitations and sales "in the home." As ACN acknowledges, its business model allows its IBOs to conduct sales and solicitations in locations other than in a home, and, the fact that the legislature used the language "to the extent" to exempt solely commission-, override-, or profit-based compensation from the definition of "employment," indicates that the legislature intended to mark a strong delineation between the exempted portion of an activity and the nonexempted portion of an activity. Here, ACN did not establish, with any certainty, the portion of its IBOs' activities that fell within the criteria of ORS 657.087(2).

ACN also argues that the statute must be construed in light of modern means of communication, such as telephone and email. To limit the statute's applicability to face-to-face in-home sales and solicitations, ACN argues, ignores the methods by which contemporary society communicates. We disagree. Telephone communication and telephone solicitations existed in 1977. The legislature, nevertheless, intended subsection (2) to exempt door-to-door sales and in-home sales, including, but not limited to, sales or solicitations that occur at home parties. The fact that ACN

was unable to establish that its relationship with its IBOs fits within the criteria of ORS 657.087(2) does not mean that the statute must be read more broadly than it was intended. We conclude that ACN cannot avail itself of the exemption in ORS 657.087(2).

## II. INDEPENDENT CONTRACTOR: CRITERIA NECESSARY FOR ACN TO ESTABLISH THAT AN IBO IS AN "INDEPENDENTLY ESTABLISHED BUSINESS"

ACN argues, alternatively, that its IBOs are independent contractors, and, therefore, under ORS 657.040(1), an IBO's services to ACN should not be deemed "employment."[3]

An "independent contractor," under ORS 670.600(2), is "a person who provides services for remuneration and who, in the provision of the services:

"(a)   Is free from direction and control over the means and manner of providing the services, subject only to the right of the person for whom the services are provided to specify the desired results;

"(b)   * * * [I]s customarily engaged in an independently established business;

"(c)   Is licensed under ORS chapter 671 or 701 if the person provides services for which a license is required under ORS chapter 671 or 701; and

"(d)   Is responsible for obtaining other licenses or certificates necessary to provide the services."

Those elements are conjunctive, and it is ACN's burden to establish that its IBOs met each of the four criteria. *Broadway Cab LLC*, 358 Or at 443; *see also Avanti*, 248 Or App at 456 ("The statutory criteria are conjunctive; a person is not considered an 'independent contractor' unless each is met."). As all four criteria are required, we begin and end with an examination of the requirement that is dispositive here, which is whether an IBO is engaged in an independently established business.

---

[3] ORS 657.040(1) provides, "Services performed by an individual for remuneration are deemed to be employment subject to this chapter unless and until it is shown * * * that the individual is an independent contractor, as that term is defined in ORS 670.600."

ORS 670.600(3) provides that a person is "considered to be customarily engaged in an independently established business if any three of the following requirements are met:

"(a)   The person maintains a business location:

"(A)   That is separate from the business or work location of the person for whom the services are provided; or

"(B)   That is in a portion of the person's residence and that portion is used primarily for the business.

"(b)   The person bears the risk of loss related to the business or the provision of services * * *[.]

"* * * * *

"(c)   The person provides contracted services for two or more different persons within a 12-month period, or the person routinely engages in business advertising, solicitation or other marketing efforts reasonably calculated to obtain new contracts to provide similar services.

"(d)   The person makes a significant investment in the business * * *[.]

"* * * * *

"(e)   The person has the authority to hire other persons to provide or to assist in providing the services and has the authority to fire those persons."

The subsections at issue in this case are whether the IBOs had separate business locations as provided in subsection (a), and whether the IBOs had the right to hire, as provided in subsection (e).[4]

A.   *Maintenance of Business Locations*

For ORS 670.600(3)(a) to apply, ACN must establish:

"The [IBO] maintains a business location:

---

[4] ACN does not contend that its IBOs met the criteria of subsection (c), and we therefore do not address that subsection.

The department argues, in a cross-assignment of error, that the ALJ erred in finding that ACN had established that its IBOs met the criteria for subsections (b) and (d). Because we conclude that ACN failed to establish that it met the requirements of subsections (a) and (e), we need not reach the cross-assignment of error.

"(A) That is separate from the business or work location of the person for whom the services are provided; or

"(B) That is in a portion of the person's residence and that portion is used primarily for the business.

In determining whether ACN established the requirements of subsection (a), the ALJ considered the following evidence from Maddux,[5] one of the IBOs included in the department's audit of ACN:

"Maddux used a desk in his home to conduct business activities, but he also used the desk for personal matters such as paying household bills. While he performed work at other locations, including customer homes and coffee shops, [ACN] failed to show that Maddux maintained a separate office space in his home or elsewhere."

The department argues that this testimony shows that IBOs failed to "maintain" separate business locations. ACN contends "maintaining" a space is not necessary to meet the criteria of ORS 670.600(3)(a). According to ACN, the purpose of the subsection is solely "to determine if there is a physical separation between the worker and the company."

That argument was rejected in *Compressed Pattern, LLC v. Employment Dept.*, 253 Or App 254, 260-61, 293 P3d 1053 (2012). There, Compressed Pattern argued that it had met the requirements of ORS 670.600(3)(a), because it had shown that the person worked at a location separate from Compressed Pattern. *Id.* at 260. In rejecting that argument, we said:

"[Compressed Pattern's] argument conflates two distinct components of ORS 670.600(3)(a)(A). Subparagraph (A), when read in context, requires the person to '*maintain* a business location' '[t]*hat is separate* from the business

---

[5] ACN argues that the ALJ erred by not considering the testimony of another IBO, Sipe, who testified regarding his business practices at the hearing. The ALJ considered Sipe's testimony "largely irrelevant," because Sipe was not one of the IBOs upon whom the department based its audit of ACN. ACN, however, does not assign error to the ALJ's decision to disregard Sipe's testimony, as required by ORAP 5.45(1), nor does ACN provide the applicable standard of review, ORAP 5.45(5), or any argument as to the basis for any error in the ALJ's decision. ORAP 5.45(6). Consequently, we express no opinion on the merits of the ALJ's decision pertaining to Sipe's testimony. *See Olsen v. Deschutes County*, 204 Or App 7, 22, 127 P3d 655, *rev den* 341 Or 80 (2006) (refusing to consider an argument that did not meet the requirements of ORAP 5.45(2), (3), (4) or (5)).

or work location of the person for whom the services are provided.' In other words, a business location must be *both* 'maintained' by the person *and* 'separate from the business or work location of the person for whom services are provided.'

"To conclude otherwise—to say, as [Compressed Pattern] argues, that a business location is maintained simply *because it is a separate work location*—would render the word 'maintain' superfluous and, more importantly, render subparagraph (B) meaningless. That latter subparagraph provides that a person can alternatively satisfy the 'maintain a business location' requirement by maintaining a business location '[t]hat is in a portion of the person's residence and that portion is used primarily for the business.' ORS 670.600(3)(a)(B). If all that were necessary for a person to 'maintain a business location' was performance of the work somewhere other than the client's business or work site, then it would not matter if that location were in a residence or what portion of a residence were used to perform the work, effectively writing subparagraph (B) out of the statute."

*Id.* at 260-61 (citation omitted; emphases in original). In light of our holding in *Compressed Pattern,* we conclude that ORS 670.600(3)(a) required ACN to establish that its IBOs maintained a business location that was separate from ACN or was in a portion of the IBO's residence that was used primarily for business. ACN failed to establish either criterion. Consequently, the ALJ was correct in concluding that ACN failed to meet that requirement.[6]

B.  *Right to Hire*

We turn our attention next to the criteria of ORS 670.600(3)(e), that an "independent contractor" have authority

---

[6] ACN argues that its IBOs' "business locations" could include coffee shops, customer's homes and even an IBO's automobile, and that this argument is supported by the Oregon Supreme Court's recent holding in *Broadway Cab LLC,* 358 Or at 446. In that case, the court concluded that taxi cab drivers were not maintaining a business location separate from Broadway's business, because Broadway's business location was "not only at its administrative offices * * *, but also in the field, where [the] taxicabs were operating," and in that way "those vehicles were not 'separate from the business or work location of [Broadway].'" *Id. Broadway Cab LLC* holds that a separate business location must be maintained, and we find no analysis in *Broadway Cab LLC* that helps ACN advance its argument that its IBOs maintained such locations in this case.

to "hire other persons to provide or to assist in providing the services[.]" ORS 670.600(3)(e). The evidence in that regard is found primarily in a provision in the "ACN Independent Business Owner Agreement," in which an IBO promises the following:

> "During the term of this Agreement, I agree that I shall not, directly or indirectly, sell or solicit customers for products or services offered by ACN through any person or entity other than that specifically designated or approved in writing by ACN."

The ALJ concluded that an IBO's agreement not to "sell or solicit customers * * * through any person or entity" meant that an IBO "could not employ any individual to directly or indirectly market [ACN's] products without [ACN's] approval." Therefore, the ALJ concluded, ACN did not establish that its IBOs met the criteria in ORS 670.600(3)(e). ACN assigns error to that determination on multiple grounds.

ACN first argues that the ALJ misinterpreted the contractual provision as prohibiting an IBO from employing a person to sell ACN's products. "Generally, to interpret a contract provision, we examine its text within the context of the entire contract in light of the circumstances underlying the contract's formation." *Watkins v. Josephine County*, 243 Or App 52, 57-58, 259 P3d 79 (2011). The text of the provision states that an IBO agrees not to sell or solicit *through* any person or entity. Thus, any method or arrangement by which an IBO sells or solicits through a person or entity is prohibited, unless it is "designated or approved in writing by ACN." In light of the fact that an employment arrangement is one method by which one would sell a product "through a person or entity," the provision, on its face, prohibits an IBO from employing a person or entity to sell or solicit customers.

ACN argues that the provision is part of a larger paragraph intended to protect ACN from an IBO working for a competitor, and that the provision, in context, means that an IBO is restricted "from selling the same products sold by ACN *on behalf of* persons or entities other than ACN." The full paragraph provides:

"During the term of this Agreement, I agree that I shall not, directly or indirectly, sell or solicit customers for products or services offered by ACN through any person or entity other than that specifically designated or approved in writing by ACN. I agree that I shall not, during the term of this Agreement and for a period of one (1) year thereafter, directly or indirectly, divert, entice, knowingly call upon, sell or solicit, take away or move any customer of ACN or any ACN Provider, whether or not I originally procured or brought such customer to ACN (such activities are collectively referred to and included herein as 'solicitation'). All customers solicited by an IBO on behalf of ACN and ACN Providers are deemed to be customers of ACN or the ACN Provider and not of the IBO. I understand that such non solicitation prohibition shall be strictly enforced and that each ACN Provider shall be a third party beneficiary of this prohibition. Further, during the term of the Agreement and for a period of one (1) year thereafter, I may not enter into a direct marketing relationship with any ACN Provider. During the term of this Agreement and for a period of one (1) year thereafter, I may not solicit an ACN IBO, whether active, inactive, individual or entity, to participate in a network marketing program offered by any other company. Without limiting in any way ACN's right to pursue all rights and remedies available to it, violation of this covenant and condition will result in, but is not limited to, forfeiture of all rights in any IBO position and ACN Payments, including all current and future commissions, bonuses and payments of any kind."

Although much of the paragraph pertains to an IBO's promises not to interfere or compete with ACN, that fact alone does not mean that every provision in the paragraph pertains solely to protecting ACN from losing customers to business competitors. It is apparent from the context of the entire contract, that the provisions are intended not only to protect ACN from its business competitors, but to protect other aspects of its particular business model. One important aspect of ACN's business model is its "sponsorship" program, which is ACN's means by which an IBO uses other persons or entities[7] to sell ACN's products. Contractual

---

[7] ACN's contract with its IBOs provides that an IBO can be a sole proprietorship, partnership, limited liability company or corporation. Consequently, a downline IBO can be a person or entity.

provisions describe and delineate how a downline sponsorship works, providing that although the sponsoring IBO receives a percentage of the commissions of a downline IBO's sales, the contractual relationship for downline IBOs remain with ACN.[8] Other provisions indicate that ACN maintains control (*e.g.*, the prohibitions against recruiting an existing downline IBO and the right to change a sponsorship for unethical practices) over the sponsorship arrangements. The provisions creating and controlling the sponsorship program indicate that ACN intended the sponsorship program to be the sole method by which IBOs were able to sell ACN's products and services *through* another person or entity. The provisions also indicate that ACN intended to protect the sponsorship program from IBO actions that might harm the program's effectiveness.

With that context in mind, we look again at the IBO's promise to not sell or solicit customers for ACN's "products or services * * * through any person or entity, other than that specifically designated or approved in writing by ACN." In light of the fact that ACN's sponsorship program is the arrangement by which an IBO sells or solicits goods and services to customers through another person or entity, the promise not to sell or solicit customers "through any person or entity" can only plausibly be construed as a prohibition on the use of another person or entity—whether through employment or otherwise—to sell ACN's "products or services," unless ACN approves of the arrangement. In other words, the provision is a limitation on an IBO's authority to hire other persons to sell or solicit customers for ACN's "products and services."

ACN argues that, regardless of whether the provision limited an IBO's authority to hire persons to sell or solicit customers for ACN's products and services, the provision did not prohibit IBOs from hiring "administrative and clerical staff who would * * * assist in the providing of service * * * as required by ORS 670.600(3)(e)." The department responds that ORS 670.600(3)(e) pertains to the authority

---

[8] The contractual language includes that any "[n]ew independent representative[] must complete and sign an Independent Representative Agreement or complete the new representative sign up process on the ACN website[.]"

to hire persons to provide or assist in the provisions of services for which the IBO was remunerated. Because an IBO was remunerated for the sales of ACN's products and services, in order to show that its IBOs had the right to hire, the department argues, ACN would have to establish that its IBOs had the authority to hire persons to sell or assist in the selling of ACN's products and services.

The Oregon Supreme Court addressed that issue in *Broadway Cab LLC*, 358 Or at 446-47. In that case, Broadway entered "Driver Agreements" with taxi cab drivers in which the drivers agreed to provide taxi cab driving services for Broadway's taxi cab company. *Id.* at 440. The "Driver Agreements" precluded other persons from driving the taxi cab vehicles, unless they were approved drivers who had separately entered into "Driver Agreements" with Broadway. *Id.* at 447. The ALJ concluded that the taxi cab drivers could not hire "other persons to provide or to assist in providing" the driving services, and therefore, the drivers did not meet the requirements of ORS 670.600(3)(e). *Id.* at 444.

On appeal, Broadway argued to the Supreme Court that the ALJ had erroneously interpreted ORS 670.600(3)(e). The court concluded that the ALJ's decision was correct, first explaining:

> "The services to which paragraph (e) refers can only be the *** services that the person provides to the employer for remuneration. In this case, those services are the driving services that the drivers provided to Broadway."

*Broadway Cab LLC*, 358 Or at 447. The court further explained:

> "Before the ALJ, Broadway relied on a provision of the 'Driver Agreements' that granted drivers the authority to hire professionals, such as mechanics, accountants, and tax professionals, to assist in their taxicab businesses. Reliance on that provision in this court would be unpersuasive. Authority to hire individuals to perform services other than driving services is not the kind of authority to which paragraph (e) refers. The relevant authority is the authority to drive, and, under the terms of the 'Driver Agreements,'

only Broadway could decide who could drive the taxicabs on its approved vehicle list. Broadway did not establish that its drivers met the requirements of paragraph (e)."

*Id.*

In this case, the services for which an IBO was remunerated were the sales of ACN's "products and services." Thus, the relevant authority is the authority to hire a person to sell or solicit customers for ACN's "products and services." Under the holding in *Broadway Cab LLC*, an IBO's authority to hire a person for administrative or clerical work "is not the kind of authority to which paragraph (e) refers." *Id.*

ACN also contends that the provision did not prohibit an IBO's authority to hire, but merely placed limitations on hiring, and that under our holding in *Portland Columbia Symphony v. Employment Dept.*, 258 Or App 411, 427-28, 310 P3d 1139 (2013), the language of ORS 670.600(3)(e) would allow such a limitation. ACN's reliance on *Portland Columbia Symphony* is misplaced. In that case, the services at issue were music services that musicians provided to a symphony. *Id.* at 414. The contract between the symphony and each musician provided that the musician could hire another person to perform as a substitute. *Id.* at 416. The symphony, though, retained the right to review the qualifications of any proposed substitute musician, and the right to veto the selection. *Id.* We noted that, although the musicians customarily called into the symphony manager to arrange a substitute, the musicians each had *authority* to hire persons "to provide or to assist in providing" the musical services. *Id.* at 427-28. Furthermore, we noted that the services at issue were for personal services, and therefore, the reserved right to review any proposed substitute musician was consistent with the nature of the contract. *Id.* at 428. Under those circumstances, we held that the symphony's veto power did not "fundamentally alter the nature of the musician's hiring * * * authority[.]" *Id.*

In this case, the IBO contract does not constitute the same type of personal services contract at issue in *Portland Columbia Symphony*, and the promise not to "sell or solicit customers * * * through any person or entity" did

not simply give ACN power to veto an unqualified potential employee. As we have already stated, in light of its context, the promise not to sell through a person or entity pertained to the *arrangement* by which an IBO could sell or solicit customers "through a person or entity." Thus, read in context, the promise that an IBO shall not "sell or solicit customers * * * through any person or entity *other than that* specifically designated or approved" by ACN, (emphasis added), was not a limitation on *who* may be hired, but on *how* an IBO may use another person or entity to provide or assist in the provision of sales of ACN's products and services. In the case of *Portland Columbia Symphony*, the musician's authority to hire existed, even though the musician's proposed employee was subject to the symphony's determination of the employee's qualifications. In this case, the authority to hire did not exist unless ACN so designated or approved in writing.

In summary, we conclude that, for ACN to establish that an IBO had the authority to hire, it needed to establish that an IBO had authority to hire a person or entity to sell or assist in the sales of ACN's "products and services." The agreement between ACN and an IBO prohibited an IBO from hiring a person or entity to sell or assist in the sales of ACN's "products and services" unless ACN approved of such arrangement. Consequently, ACN did not establish that an IBO meets the requirements of ORS 670.600(3)(e).

Having concluded that ORS 657.087(2) did not apply to the IBOs, and that the IBOs were not independent contractors under ORS 670.600(3), we therefore conclude that the ALJ did not err in affirming the department's determination that ACN was an "employer."

Affirmed.