NAKAMOTO, J.
**826 Petitioner ACN Opportunity, LLC (ACN) sells satellite television, telephone, internet, and home security services, as well as some goods related to those services, through a network of direct-to-consumer sellers that it calls "independent business owners" (IBOs). The Employment Department determined that ACN was an employer and thus was required to pay unemployment insurance tax on earnings that ACN paid to the IBOs for their sales work. An administrative law judge (ALJ) affirmed that determination, concluding that the IBOs did not fall within the exemption from employment under ORS 657.087(2) and were not independent contractors under ORS 670.600. ACN sought judicial review of the department's final order, and the Court of Appeals affirmed. ACN Opportunity, LLC v. Employment Dept. , 278 Or. App. 697, 377 P.3d 638 (2016).
This court accepted review primarily to address the statutory interpretation questions that this case presents. We first conclude that the IBOs do not qualify as independent contractors, because ACN failed to establish that the IBOs were customarily engaged in an independently established business. In reaching that conclusion, (1) we construe "maintains a business location" in ORS 670.600(3)(a), a factor considered in determining whether a worker has an independently established business, as the Court of Appeals did, and (2) we agree with the Court of Appeals that the IBOs lack the required authority to hire others to provide services, as provided in ORS 670.600(3)(e). Finally, we reject ACN's reading of the in-home sales exemption from employment in ORS 657.087(2) and conclude that the IBOs do not fall within that exemption. As a result, we affirm the decision of the Court of Appeals and the final order of the ALJ.
I. BACKGROUND
A. Legal context
For purposes of unemployment insurance tax liability, Oregon law begins with the presumption *721 that a person **827 who performs services for remuneration is an employee, and the employer must pay unemployment insurance taxes on that person's wages. See ORS 657.505(2). As relevant in this case, there are two categories of workers who are not considered employees: (1) independent contractors, as defined in ORS 670.600, and (2) certain commissioned salespeople, as defined in ORS 657.087. If an employer can prove that a purported employee is in fact an independent contractor or one of the salespeople excluded by ORS 657.087, then the employer need not pay unemployment insurance taxes on that person's remuneration.
An "independent contractor" is defined in ORS 670.600(2) as "a person who provides services for remuneration and who, in the provision of the services," meets four enumerated requirements:
"(a) Is free from direction and control over the means and manner of providing the services, subject only to the right of the person for whom the services are provided to specify the desired results;
"(b) *** [I]s customarily engaged in an independently established business;
"(c) Is licensed under ORS chapter 671 or 701 if the person provides services for which a license is required under ORS chapter 671 or 701; and
"(d) Is responsible for obtaining other licenses or certificates necessary to provide the services."
All four criteria must be satisfied for the test to be met, and the alleged employer bears the burden of proof. Broadway Cab LLC v. Employment Dept. , 358 Or. 431, 443, 364 P.3d 338 (2015). In this case, the dispute over whether the IBOs are independent contractors boils down to the requirement in subsection (2)(b): whether ACN proved that its IBOs were "customarily engaged in an independently established business."
Subsection (3) of ORS 670.600 provides five factors that the department is to consider in determining whether the putative employer has shown that the worker meets the **828 "independently established business" requirement.[1] If ACN established that its IBOs met at least three out of the five factors in ORS 670.600(3), then the IBOs are "customarily engaged in an independently established business" for purposes of subsection (2)(b). Two of those factors are now at issue; namely, whether each IBO "maintains a business location" or "has the authority to hire other persons to provide or to assist in providing the services and has the authority to fire those persons." ORS 670.600(3)(a), (e).
The other statute relevant on review is the in-home sales exemption in ORS 657.087(2). That exemption provides that "[e]mployment" does not include "service performed * * * [b]y individuals to the extent that the compensation consists of commissions, overrides or a share of the profit realized on orders solicited or sales resulting from the in-person solicitation of orders for and making sales of consumer goods in the home." The issue arising from that statute is whether someone can satisfy its requirements by primarily soliciting orders and making sales in the home, or if the statute limits its application only to those orders solicited and sales made in the home.
B. Historical facts
ACN has not challenged the ALJ's factual findings. Therefore, we draw the following *722 facts from the ALJ's final **829 order and, as needed, consider other uncontested facts in the record to determine whether the ALJ committed any errors of law. See ORS 183.482(7) ("the court shall not substitute its judgment for that of the agency as to any issue of fact").
ACN, a subsidiary of ACN, Inc., is registered and has its principal office in North Carolina. ACN is an authorized retailer of various telecommunications services, including satellite television, high-speed and wireless internet, local and long-distance telephone, and home security services, along with related goods, that originate from various third-party national vendors. ACN enters into agreements with the vendors, and then ACN sells the products through its network of sellers, the IBOs.
The relationship between ACN and an IBO is governed by a written contract. Each of the IBOs agreed that the IBO would pay ACN an initial fee of $499 for a one-year license to market and sell ACN's products. The IBO then could pay an annual renewal fee of $149 per year. The IBO contract stated that ACN and the IBO agreed that the IBO would market and sell ACN's products as an independent contractor, not as ACN's employee.
The IBOs were compensated through bonuses from a new customer's subscription to ACN's services and through commissions from a customer's continued use of those services. In addition to making money from their own sales, the IBOs could "sponsor" or recruit other IBOs, who the parties refer to as "downline IBOs," and receive additional compensation from the downline IBOs' customers' subscriptions and continued use of ACN's products and services.
However, the downline IBOs were required to have their own separate IBO contracts with ACN. The IBO contracts prohibited IBOs from recruiting an existing downline IBO during the term of the existing downline IBO's contract and for one year after the downline IBO's contract ended. ACN also reserved the right to change a downline IBO's sponsorship if "unethical" practices were used, which included soliciting a prospect who was "considering joining ACN and being sponsored by another" IBO. Furthermore, the IBO contract prohibited downline IBOs from switching sponsors.
**830 In return for payment of the initial fee, the IBOs received a "Team Trainer Kit," as well as access to ACN's customer tracking services, ACN's website for submitting all customer orders, and ACN's back office and call center services. For a monthly fee, the IBOs could create personalized distributor websites on ACN's official company website. Other tools and services, such as computers, telephones, training assistance, and marketing materials, were not provided by ACN as part of the initial license or monthly fee, but some could be purchased from ACN.
The IBO contracts gave the IBOs freedom to determine the location of their operation and how many or few hours they worked. ACN did not provide office space for the IBOs and, in fact, did not operate an office in Oregon. The IBOs solicited orders and sold ACN's products at various locations in Oregon, including in coffee shops, hotel conference rooms, and the homes and offices of their customers.
However, ACN limited the methods that the IBOs could use to solicit sales. The IBO contract prohibited "cold marketing" techniques, which ACN defined as "promotional activity that is geared toward random individuals who have no personal, business, social or acquaintance relationship(s) with the promoter." Examples included "mass advertising, purchased leads, trade show participation, door-to-door selling, telemarketing, pamphlet distribution, etc." In their contracts, IBOs also promised not to, "directly or indirectly, sell or solicit customers for products or services offered by ACN through any person or entity other than that specifically designated or approved in writing by ACN."
ACN had IBO contracts with multiple individuals in Oregon during the period at issue. It is undisputed that those IBOs performed services for remuneration and that ACN paid the IBOs for their services.
*723 C. Procedural history
After multiple IBOs made claims for unemployment insurance benefits in Oregon, the department investigated the claims and issued an initial determination that each IBO performed services for ACN as an employee and, consequently, that ACN was an employer subject to Oregon **831 Employment Department law. The department issued an order assessing ACN unemployment insurance taxes and interest of $798.80.
ACN requested a hearing to challenge the department's determination that the IBOs were ACN's employees. The ALJ concluded that ACN had failed to prove that its IBOs fell within the in-home sales exemption under ORS 657.087(2) because ACN did not prove the extent to which the IBOs' compensation consisted of commissions from sales of "consumer goods" that occurred "in the home."
The ALJ also rejected ACN's alternative argument that the IBOs were independent contractors. The ALJ determined that the IBOs failed to meet two of the four requirements for "independent contractor" status in ORS 670.600(2) : first, ACN had not shown that the IBOs were "free from direction and control over the means and manner" of providing services, as required by subsection (a); and second, ACN had not shown that the IBOs were engaged in independently established businesses under subsection (b). As to the independently established business requirement, the ALJ concluded that ACN had proved only that its IBOs met two of the five factors in ORS 670.600(3)-subsection (b), pertaining to bearing risk of loss, and subsection (d), pertaining to significant investment in the business. Accordingly, the ALJ concluded that the IBOs were under ACN's employment and that ACN was required to pay unemployment insurance taxes.
On appeal, the Court of Appeals affirmed the ALJ's decision. After examining the in-home sales exemption in ORS 657.087(2), the court concluded that ACN had failed to prove that its IBOs fell within the exemption. ACN Opportunity , 278 Or. App. at 705-09, 377 P.3d 638. The court next examined and rejected ACN's alternative argument that the IBOs were independent contractors. Because it was dispositive, the court focused on the requirement in ORS 670.600(2)(b) that the person be "customarily engaged in an independently established business." Id. at 710-19, 377 P.3d 638.
The Court of Appeals assumed, as the ALJ had determined, that ACN had established that its IBOs met **832 two of the necessary three factors to prove that they had independently established businesses. However, the court concluded that ACN had not established a third factor.[2] The court determined that the "maintains a business location" factor in ORS 670.600(3)(a) was not met because ACN had failed to prove that the IBOs "maintained" their business locations. 278 Or. App. at 713, 377 P.3d 638. And, in light of a provision in the IBO contract, the court determined that the IBOs lacked authority to "hire other persons to provide or to assist in providing the services," so the factor in ORS 670.600(3)(e) was not met. Id. at 718-19, 377 P.3d 638. Thus, the court concluded, the ALJ correctly affirmed the department's determination that ACN was an "employer" and was required to pay unemployment insurance taxes. Id. at 719, 377 P.3d 638. We allowed review to address the interpretation of ORS 657.087(2) and ORS 670.600(3).
II. ANALYSIS
A. Independent contractor status-"independently established business"
ACN's primary argument in this court is that it proved that the IBOs are independent contractors. As the department asserts, whether ACN met its burden of establishing the "independently established business" requirement in ORS 670.600(2)(b) is dispositive on that issue. To meet its burden, ACN had to prove that the IBOs met at least three of the factors listed in ORS 670.600(3). ACN again argues that it met that burden because it had proved a third factor, either through the "maintains a business location" factor in ORS 670.600(3)(a) or the hiring-and-firing- *724 authority factor in ORS 670.600(3)(e). We conclude that ACN failed to meet its burden and that the department and the Court of Appeals correctly construed and applied ORS 670.600(3)(a) and (e).
1. "Maintains a business location" under ORS 670.600(3)(a)
Under ORS 670.600(3)(a), ACN was required to prove that each IBO "maintains a business location" that is **833 either (A) "separate from the business or work location of the person for whom the services are provided," or (B) "a portion of the person's residence and that portion is used primarily for the business." Both the ALJ and the Court of Appeals determined that the IBOs did not maintain business locations as required by ORS 670.600(3)(a). Based on its decision in Compressed Pattern, LLC v. Employment Dept. , 253 Or. App. 254, 260-61, 293 P.3d 1053 (2012), the Court of Appeals held that ORS 670.600(3)(a) requires proof that the person alleged to be an independent contractor "maintains" a business location and that the business location is separate from the business location of the entity for whom the services are provided. ACN Opportunity , 278 Or. App. at 713, 377 P.3d 638. ACN, in contrast, construes the statute to mean that a separate location is sufficient and that "maintain" is not an independent requirement.
Initially, we address ACN's contention that the statutory construction issue has already been decided against the department. ACN argues that the Court of Appeals' determination that the word "maintains" has independent significance runs contrary to this court's decision in Broadway Cab , which also involved an application of ORS 670.600(3)(a).
We disagree that Broadway Cab controls, because that case turned on whether the workers-cab drivers-had a "separate" business location from the cab company, as provided in ORS 670.600(3)(a)(A). This court did not discuss the requirement in ORS 670.600(3)(a) that the drivers "maintain" their business locations. Rather, this court assumed, without deciding, that the drivers maintained business locations in their taxicabs. 358 Or. at 446, 364 P.3d 338 ("even if the drivers' businesses were located in their taxicabs, those vehicles were not 'separate from the business or work location of [Broadway]' ") (emphasis added). This court also determined that the company's business, which "was located not only at its administrative offices, where its administrative functions were performed, but also in the field, where its taxicabs were operating," was not separate from the cab drivers' business locations. Id. Because the dispositive issue was whether the cab drivers had business locations separate from the company's business location, Broadway Cab does **834 not control on the meaning of "maintains a business location" in ORS 670.600(3)(a), and the meaning of that phrase remains an issue that this court has not yet addressed.
That issue involves statutory construction, which we resolve by applying the principles set out in PGE v. Bureau of Labor and Industries , 317 Or. 606, 610-12, 859 P.2d 1143 (1993), and State v. Gaines , 346 Or. 160, 171-72, 206 P.3d 1042 (2009). To discern the underlying statutory intent, we first examine the text of the statute in context and consider legislative history as pertinent. State v. Walker , 356 Or. 4, 13, 333 P.3d 316 (2014) ; Gaines , 346 Or. at 171-72, 206 P.3d 1042.
The words in the phrase "maintains a business location" are not statutorily defined, so we assume that the legislature intended to give them their ordinary meanings. State v. Dickerson , 356 Or. 822, 829, 345 P.3d 447 (2015). The "ordinary" meaning of a word is presumed to be what is reflected in the dictionary. Jenkins v. Board of Parole , 356 Or. 186, 194, 335 P.3d 828 (2014).
First, we consider the intended meaning of the term "business location." In part, Webster's defines "location" to mean "a position or site occupied or available for occupancy (as by a building) or marked by some distinguishing feature." Webster's Third New Int'l Dictionary 1327 (unabridged ed. 2002). That definition suggests that a business location must be a physical place that a person can occupy, such as an office or a room in a house.
That conclusion is supported by the legislative history of ORS 670.600, which was originally introduced as Senate Bill (SB) 323 *725 (2005). 2005 Or. Laws, ch. 533, §§ 1-2. The text of SB 323 was drafted by the Independent Contractors Task Force, a group of government representatives and stakeholders that was established to study the issues related to the definition of an independent contractor. 2003 Or. Laws, ch. 704, § 7a.
After several meetings over the course of a year, the task force submitted an executive summary to the legislature that included background information, findings, and recommendations, as well as proposed language for the new statute. Those materials are particularly useful in our **835 inquiry here because the legislature adopted and enacted the task force's proposed text in its entirety and almost without modification. See Dept. of Human Services v. G. D. W. , 353 Or. 25, 35, 292 P.3d 548 (2012) (citing Legislative Commentary to the Oregon Evidence Code as legislative history); Ram Technical Services, Inc. v. Koresko , 346 Or. 215, 234-35, 208 P.3d 950 (2009) (citing Oregon Law Commission report as legislative history); State v. Woodley , 306 Or. 458, 462, 760 P.2d 884 (1988) (explaining that, in the case of the Criminal Law Revision Commission, "[w]e generally assume in the absence of other legislative history that the Legislative Assembly accepted the commission's explanations").
The Independent Contractors Task Force Report and testimony regarding SB 323 repeatedly refer to "business location[s]" as either office spaces or portions of a home. Elizabeth Harchenko, a member of the task force and the Director of the Oregon Department of Revenue, noted during her testimony before the Senate Committee on Business and Economic Development that an "identifiable business location" can be shown "one of two ways. Either you've got an office somewhere where * * * you have office space, or, if you're operating out of your home, * * * you can identify someplace in your home where you actually carry on those activities." Audio Recording, Senate Committee on Business and Economic Development, SB 323, Feb. 24, 2005, at 15.42 (comments of Elizabeth Harchenko), https://olis.leg.state.or.us (accessed Apr. 30, 2018). She made similar comments in her testimony before the House Committee on Business, Labor and Consumer Affairs. Audio Recording, House Committee on Business, Labor and Consumer Affairs, SB 323, May 20, 2005, at 1:23.20 (comments of Elizabeth Harchenko), https://olis.leg.state.or.us (accessed Apr. 30, 2018) (explaining that an identifiable business location can be a person's "own home if they work out of their home, or it can be a separate office that they maintain for themselves").
The Independent Contractors Task Force Report described the "business location" requirement by noting that "[a] business usually has some business location of its own." Exhibit C, Senate Committee on Business and Economic Development, SB 323, Feb. 24, 2005. However, the legislative **836 history is clear that not all of an independent contractor's services need to be performed from a single business location. In some industries, for example, the work may be performed almost entirely in the field, and the business location is used only for administrative functions. Exhibit C, Senate Committee on Business and Economic Development, SB 323, Feb. 24, 2005. And if the business location is in a person's residence, "it must be in some portion (but not necessarily an entire room) of the residence that is used primarily (but not necessarily exclusively) for the business." Id.
The legislature thus envisioned that a variety of possible spaces might amount to a business location, depending on the circumstances. The task force concluded that "any determination would have to be based on the whole set of facts involved in a case-by-case basis." Exhibit C, Senate Committee on Business and Economic Development, SB 323, Feb. 24, 2005 (Appendix D).
But the legislature's flexible approach to "business location" is tempered by the requirement in ORS 670.600 (3)(a) at issue in this case: the putative independent contractor must "maintain" that business location. The term "maintain" appears to be a distinct requirement.
The word "maintain" has a number of potential dictionary definitions, but only two are relevant to physical locations:
"1 : to keep in a state of repair, efficiency, or validity : preserve from failure or decline *726 < exercise ... sufficient to [maintain] bodily and mental vigor -H.G. Armstrong> *** 4 : provide for : to bear the expense of : SUPPORT < the lady of beauty is [maintain]ed as the pampered wife of a wealthy man -Lucy Crockett> < two homes, with 145 beds, are [maintain]ed for the aged and indigent -Americana Annual >[.]"
Webster's at 1362. Both of those definitions imply some action on the part of the person doing the maintaining. Therefore, it appears that, to "maintain[ ] a business location" as required by ORS 670.600(3)(a), a contractor must take some affirmative action-more than, for example, temporarily occupying a table at a coffee shop.
**837 In contrast, ACN contends that, when used in reference to a place of business, the word "maintain" generally means no more than "to have." ACN cites a choice-of-law statute as an example, see ORS 15.420(2) (providing that the "domicile of a person other than a natural person is located in the state in which the person maintains its principal place of business" (emphasis added)), but ACN provides no authority supporting its view of that statute. As we understand it, ACN's argument is that it would be sufficient to satisfy ORS 670.600(3)(a) for the putative independent contractor to state that he or she has a business location. We are not aware of any Oregon cases that have explicitly interpreted the term in that way, and there are cases suggesting that "maintains" does not have that meaning. See, e.g. , Willamette Nat. Lbr. Co. v. Cir. Ct., Mult. Co. , 187 Or. 591, 614-15, 211 P.2d 994 (1949) (suggesting that, for venue, maintaining an actual principal place of business is different from merely having one by designating it in articles of incorporation for legal purposes). And even were ACN correct about what "maintains" means when used in ORS 15.420(2), we are not convinced that the choice-of-law statutes provide appropriate context for understanding the term "maintains" in ORS 670.600 given the different purposes of the two statutory schemes.[3]
Finally, reading "maintain" as used in ORS 670.600(3)(a) to mean merely "have" in the sense that ACN uses that term would generate anomalous results. For example, ACN argues that an IBO could satisfy subsection (3)(a) by operating out of a local coffee shop simply because the coffee shop is separate from ACN's place of business. But if that is correct, then it would be unnecessary for ORS 670.600 (3)(a)(B) to require both a showing that the workers use a portion of their residence as their place of business and that that portion is used "primarily" for the business. See ORS 670.600(3)(a)(B) (if a person "maintains a business location"
**838 in their home, that portion of the home must be "used primarily for the business"). It seems incongruous that an IBO using a coffee shop as a place of business could theoretically satisfy subsection (3)(a) by using the coffee shop primarily as a place to meet friends and only occasionally using it as a business location, but an IBO using a portion of his or her residence would not satisfy that requirement, absent a showing of use primarily for business endeavors.
To avoid such an incoherent result and to conform with its ordinary meaning, the word "maintains" in ORS 670.600(3)(a) must have some meaning beyond simply "having" a business location. That could include, for example, paying rent to use the business location, physically preserving the business location in a state of repair, or using and holding out the location to the public as the location of the business. In short, we reject the idea that the "maintains a business location" factor requires nothing more of the purported independent contractor than simply transacting business, so long as it is not at the purported employer's business location.
With that understanding of ORS 670.600(3)(a), like the Court of Appeals, we *727 conclude that ACN did not establish that its IBOs maintained business locations. The ALJ found that the IBOs met with potential customers in their homes, in coffee shops, and the in homes of third parties. But conducting business in coffee shops or at a variety of different premises, without further evidence that the person maintained the space as their business location, is insufficient to show that a person "maintain[ed] a business location." ACN failed to establish that any IBO had rented or otherwise engaged in affirmative maintenance of a business location.[4] Thus, ACN did not show that any of the IBOs "maintain[ed] a business location" as required by ORS 670.600(3)(a).
2. Authority to hire and fire under ORS 670.600(3)(e)
ACN also relies on the factor in ORS 670.600 (3)(e), which requires that an independent contractor have **839 "authority to hire other persons to provide or to assist in providing the services " and also have "authority to fire those persons." (Emphasis added.) The "services" to which subsection (e) refers are "the services that the person provides *** for remuneration." Broadway Cab , 358 Or. at 447, 364 P.3d 338. The ALJ and the Court of Appeals concluded that the IBOs do not have such authority because the ability of the IBOs to hire others to sell ACN's services and products was contingent on ACN's approval under Paragraph 20 of the IBO contract, which every IBO was required to sign.
On review, ACN first contends that the ALJ and the Court of Appeals misconstrued the IBO agreement. We decide that question using basic contract construction principles. We first consider the text of the disputed part of the contract in the context of the contract as a whole. Yogman v. Parrott , 325 Or. 358, 362-63, 937 P.2d 1019 (1997). As part of that context, a court may consider "the circumstances under which [the instrument] was made, including the situation of the subject and of the parties." ORS 42.220 ; Abercrombie v. Hayden Corp. , 320 Or. 279, 292, 883 P.2d 845 (1994) (under ORS 42.220, a court may consider extrinsic evidence to determine whether the terms of a contract are ambiguous). "The court must, if possible, construe the contract so as to give effect to all of its provisions." Williams v. RJ Reynolds Tobacco Company , 351 Or. 368, 271 P.3d 103 (2011). If the disputed contract provision is unambiguous, then "the court construes the words of a contract as a matter of law" and gives effect to the parties' intentions. Eagle Industries, Inc. v. Thompson , 321 Or. 398, 405, 900 P.2d 475 (1995).
In this case, the disputed part of the IBO contract is the first sentence of Paragraph 20. That sentence provides: "During the term of this Agreement, I agree that I shall not, directly or indirectly, sell or solicit customers for products or services offered by ACN through any person or entity other than that specifically designated or approved in writing by ACN." The ALJ and the Court of Appeals concluded that, understood in the context of the contract as a whole and in light of the relevant circumstances of the parties when entering the contract, particularly ACN's business model, the first sentence of Paragraph 20 restricts an IBO from **840 employing individuals to market ACN's products without ACN's approval. ACN Opportunity , 278 Or. App. at 714, 377 P.3d 638.
ACN argues that the Court of Appeals failed to grasp the actual meaning of the first sentence by isolating it from its proper context, the entirety of Paragraph 20.[5] In ACN's *728 view, because the intended purpose of Paragraph 20 as a whole is to prevent the IBOs from competing with ACN by diverting customers away from ACN, the first sentence must be understood in the same way. Thus, ACN argues, the first sentence, particularly the phrase "through any person or entity other than that specifically designated or approved in writing by ACN," was not intended to restrict IBOs from performing services for ACN through employees, but rather to restrict the IBOs from working for competitors.
We agree with the Court of Appeals that ACN's interpretation of the first sentence is implausible. ACN Opportunity , 278 Or. App. at 716, 377 P.3d 638. As to the meaning ACN accords to the first sentence, it would make little sense for ACN to approve of the competitors for whom its IBOs would work. Moreover, the context for understanding the first sentence of Paragraph 20-other contract provisions protecting the ACN sponsorship program and ACN's relationship with downline IBOs-illuminates that the department's reading, not ACN's, comports with the contract as a whole.
**841 ACN's sponsorship program is an important aspect of its business model. Through the sponsorship program, the IBOs are permitted to use other persons or entities to sell ACN's products by sponsoring downline IBOs, allowing the sponsoring IBO to receive a percentage of the commissions from the downline IBO's sales. However, the downline IBO's contractual relationship remains with ACN, not the sponsoring IBO. Thus, ACN maintains control over who may become a downline IBO. Read in that context, Paragraph 20 indicates ACN's intention to protect that model by obliging the IBOs to use the sponsorship program to sell ACN's products through another person or entity.
Alternatively, ACN argues, even if Paragraph 20 prohibits the IBOs from hiring and firing without ACN's consent, that paragraph only applies to the employment of others to "sell or solicit customers." Distinguishing Broadway Cab , in which the only service that the cab drivers provided for remuneration was driving, 358 Or. at 447, 364 P.3d 338, ACN argues that the role of an IBO is complicated and includes a number of necessary tasks that do not include making the actual sales or soliciting customers. Those tasks include identifying potential customers, arranging sales appointments, and ensuring customer satisfaction after a sale. Were Paragraph 20 to impose some limitation on who can make sales or solicit customers, ACN argues, the IBOs would still be free to hire third parties to perform any of those other tasks, and so ACN established that IBOs have the necessary authority to hire and fire.
Even assuming that the other tasks that ACN identifies do not constitute selling products or soliciting customers, the fact that IBOs can hire people to assist in those aspects of the work is insufficient to satisfy ORS 670.600 (3)(e). That is because the question under the statute is whether the IBOs can hire and fire others to perform the services that the IBOs perform for remuneration. Broadway Cab , 358 Or. at 447, 364 P.3d 338 ; see also Audio Recording, Senate Committee on Business and Economic Development, SB 323, Feb. 24, 2005, at 17.35 (comments of Elizabeth Harchenko), https://olis.leg.state.or.us (accessed Apr. 30, 2018) ("The contractor is the one who has the right to hire or fire assistants in order to perform the contracted service. So, if I'm a **842 contractor and I'm coming to provide a service for you, I can bring my own employees with me to provide that service, you can't tell me who I can hire or fire and bring and have on the job, that's my *** role.").
In this case, the service that the IBOs provide for remuneration to ACN is selling ACN's products and services. The first sentence of Paragraph 20 restricts the IBO's *729 ability to hire employees to provide or assist in providing that service. Thus, we reject ACN's argument that any authority to hire and fire is inconsistent with being an employee. See Broadway Cab , 358 Or. at 447, 364 P.3d 338 (a cab driver's authority to hire others to assist in the taxicab business, such as mechanics and tax professionals, is not relevant when the services are driving services).
In sum, we conclude that ACN has not proven that the IBOs are engaged in an independently established business, one of the elements required by ORS 670.600(2). Therefore, ACN's IBOs do not qualify for the independent contractor exemption from employment in ORS 670.600.
B. Exemption from "employment" for sales "in the home"
That leaves ACN's alternative argument for decision: that its IBOs are exempt from the definition of employment because they meet the requirements of the in-home sales exemption in ORS 657.087(2). As noted at the outset, ORS 657.087(2) provides an exemption from employment for services performed "[b]y individuals to the extent that the compensation consists of commissions, overrides or a share of the profit realized on orders solicited or sales resulting from the in-person solicitation of orders for and making sales of consumer goods in the home."
ACN first argues that the IBOs' services qualify for the in-home sales exemption so long as their sales and solicitations occur primarily "in the home." Again, we interpret the statute by first examining its text. Gaines , 346 Or. at 171, 206 P.3d 1042.
The exemption applies "to the extent that" an individual's compensation results from soliciting orders or making sales "in the home." The dictionary defines "extent," in relevant part, as follows:
**843 "5 a (1) : the range (as of inclusiveness or application) over which something extends : SCOPE, COMPASS, COMPREHENSIVNESS < within the [extent] of human knowledge> < the [extent] of his authority> < the [extent] of the law> (2) : the point or degree to which something extends < they spent money to the [extent] of $1500> : the limit to which something extends < exerting the full [extent] of his power> < to a certain [extent] she was fond of him>[.]"
Webster's at 805. Therefore, the ordinary meaning of the word "extent" indicates that the exemption applies only to a particular limit and no farther. Given that ordinary meaning, we conclude that the legislature likely intended that, if an individual receives some compensation for orders or sales solicited or made in the home, then the exemption applies only to the individual's compensation that results from those orders and sales. To accept ACN's reading, we would have to expand the statute by reading in the word "primarily." See State v. McNally , 361 Or. 314, 328, 392 P.3d 721 (2017) ("It is axiomatic that this court does not insert words into a statute that the legislature chose not to include.").
Our interpretation is also supported by the legislative history of ORS 657.087(2), which illustrates that the statute was intended to create a fairly narrow exemption aimed primarily at a particular industry: Tupperware sales. The statute originated as House Bill (HB) 2238 (1977), and was introduced to reverse the result of a case, Timberland Sales v. Employment Div. , 20 Or. App. 192, 530 P.2d 880, reh'g den. , rev. den. (1975), in which the Court of Appeals upheld the Oregon Employment Division's determination that Tupperware dealers were employees for unemployment insurance tax purposes. See Tape Recording, House Labor Committee, HB 2238, Feb. 9, 1977, Tape 5, Side 2 (statement of Gene Vorhees). Before the 1977 amendment, former ORS 657.087 (1975) only contained an exemption for home improvement solicitations.
The legislative history is dominated by references to the Tupperware industry and testimony from Tupperware representatives, and at least one legislator referred to HB 2238 simply as "the 'Tupperware' bill." Minutes, Senate Labor, Consumer and Business Affairs Committee, HB 2238, Apr. 8, 1977, 2. Another legislator expressed his support **844 for the bill, but "stressed that the [l]egislature was going to have to get its act together *730 on the question of independent contractors and a variety of other things" because he saw the exemption created by HB 2238 as a "stop-gap measure, but he could see this list growing weekly." Minutes, Senate Labor, Consumer and Business Affairs Committee, HB 2238, Apr. 8, 1977, 2. Those statements indicate that the legislature understood that the statute's application would be fairly limited.
Limiting the ORS 657.087(2) exemption to an individual's compensation only "to the extent that" it results from soliciting orders or making sales "in the home" makes sense given the Tupperware business model. Tupperware dealers typically sell Tupperware through home parties, wherein a host invites a Tupperware dealer into the host's home to entertain guests and demonstrate the Tupperware product for the purpose of soliciting orders for Tupperware. See Exhibit A, House Labor Committee, HB 2238, Feb. 9, 1977 (explaining that dealers sell Tupperware "primarily through home parties"); Timberland Sales , 20 Or. App. at 194-95, 530 P.2d 880 (explaining the Tupperware sales process). The sponsor of HB 2238, Representative Glen Whallon, explained that he intended the bill to apply to all door-to-door salespeople, not only to Tupperware dealers, but that he did not intend for it to cover sales that occur anywhere. Tape Recording, House Labor Committee, HB 2238, Feb. 9, 1977, Tape 5, Side 2 (statement of Rep. Glen Whallon).
In arguing otherwise, ACN points to 26 USC § 3508, enacted by Congress in 1982 to define the direct-seller exemption from employment at the federal level. That statute, which was enacted after the statute at issue in this case, defines "direct seller" as a person who is "engaged in the trade or business of selling (or soliciting the sale of) consumer products *** in the home or otherwise than in a permanent retail establishment ." 26 USC § 3508(b)(2)(A)(i) (emphasis added). ACN also observes that the Oregon legislature adopted that same language in 1983 in ORS 316.209, which defines "direct seller" for tax purposes. See ORS 316.209(3)(a)(B) (defining a direct seller as a person who is "[e]ngaged in the trade or business of selling, or soliciting **845 the sale of, consumer products in the home or otherwise than in a permanent retail establishment").
ACN argues that it makes no sense for direct sellers like its IBOs to be treated as employees in some contexts (unemployment taxes) but as exempt from the definition of employment in other contexts (income taxes). It relies on S-W Floor Cover Shop v. Natl. Council on Comp. Ins. , 318 Or. 614, 627-28, 872 P.2d 1 (1994), for the proposition that the legislative history of ORS 670.600"strongly suggest[ed] that the primary purpose of [the bill] was to achieve uniformity in who qualifies as an independent contractor, so that one who is an independent contractor for purposes of one of the four laws cited * * * would also be an independent contractor for purposes of the other three laws." In making that argument, however, ACN reads S-W Floor Cover Shop too expansively.
That case concerned the meaning of the phrase "direction and control," which appeared both in the workers' compensation statute at issue, ORS 656.005(28) (concerning who is a "worker"), and in the definition of an independent contractor in ORS 670.600. S-W Floor Cover Shop , 318 Or. at 624, 872 P.2d 1. This court observed that the legislative history of ORS 670.600 revealed that the " 'independent contractor' statutes originated in a Joint Interim Committee on Labor, Subcommittee on Independent Contractors, which convened in 1988 to develop a statutory definition for 'independent contractor' that would apply, not only to workers' compensation law, but also to unemployment compensation law, tax law, and construction contractor law." Id. at 625, 872 P.2d 1. Ultimately, this court concluded that "the same 'direction and control' test appears in both ORS 656.005(28) and ORS 670.600." Id. at 630, 872 P.2d 1.
But S-W Floor Cover Shop and the later-enacted federal and state taxation statutes do not inform our analysis of ORS 657.087(2). First, the issue presented here is the meaning of the in-home sales exemption for unemployment insurance taxation enacted in 1977, not an aspect of the definition of "independent contractor" in ORS 670.600. The latter was intended to apply across different contexts; the in-home sales exemption addressed a particular judicial decision **846 and a particular *731 kind of industry focused on in-home sales. Second, the text of Oregon's in-home sales exemption significantly differs from the text of the later-enacted tax statutes concerning direct sellers. Those statutes are not contextually relevant to the determination of the legislature's intent in enacting ORS 657.087(2).
We hold that ORS 657.087(2) provides an exemption from employment only for that portion of a person's compensation that results from soliciting orders or making sales "in the home." Thus, if someone conducts all sales in the home, then all of the seller's compensation may be exempt under ORS 657.087(2) ; however, if only half of that person's compensation can be attributed to orders solicited or sales made in the home, then only half of their compensation may be exempt under that statute.[6]
Given the facts in this case, ACN did not establish that the work of the IBOs qualified for the exemption in ORS 657.087(2). The relevant portions of the ALJ's findings are uncontested: the IBOs conducted sales and solicitations in numerous locations other than in homes, including in customers' offices, coffee shops, and hotel conference rooms. The ALJ also found that ACN did not establish what portion of the IBOs' sales occurred "in the home" such that they could satisfy ORS 657.087(2) : "although it appears that some of the sales resulted from face-to-face contacts in customer homes, [ACN] failed to show to what extent this occurred."
In conclusion, under the independent contractor statute, ORS 670.600(3)(a) requires a showing that a person "maintains" a business location and ORS 670.600(3)(e) requires that the worker have authority to hire and fire others to perform the services for which the worker receives remuneration. Further, the exemption in ORS 657.087(2) applies only to the compensation that the worker receives for orders or sales made "in the home" and not in other locations. The ALJ and the Court of Appeals properly applied those standards in this case.
**847 The decision of the Court of Appeals and the final order of the administrative law judge are affirmed.
Balmer, C. J., concurred in the judgment and filed an opinion.

ORS 670.600(3) provides:
"[A] person is considered to be customarily engaged in an independently established business if any three of the following requirements are met:
"(a) The person maintains a business location:
"(A) That is separate from the business or work location of the person for whom the services are provided; or
"(B) That is in a portion of the person's residence and that portion is used primarily for the business.
"(b) The person bears the risk of loss related to the business or the provision of services ***.
"(c) The person provides contracted services for two or more different persons within a 12-month period, or the person routinely engages in business advertising, solicitation or other marketing efforts reasonably calculated to obtain new contracts to provide similar services.
"(d) The person makes a significant investment in the business ***.
"(e) The person has the authority to hire other persons to provide or to assist in providing the services and has the authority to fire those persons."

The Court of Appeals declined to reach the department's cross-assignment of error challenging the ALJ's determination that the IBOs met those two factors. ACN Opportunity , 278 Or. App. at 711 n. 4, 377 P.3d 638.

The purpose of the choice-of-law statutes is to determine which state's law should apply to a business, and the law of some state must apply, so it is a foregone conclusion that a business "maintains" a "principal place of business" somewhere . The question in that context is not if a principal place of business is maintained, but where it is maintained. In contrast, the word "maintain" in ORS 670.600 is part of a requirement that may or may not be met, because the point of the statute is to determine whether the worker actually has his or her own business and qualifies as an independent contractor.

The ALJ found that the only IBO who testified at the hearing stated that he used a portion of his home, a desk, for both his work as an IBO and for personal activities. But ACN failed to establish that he used that portion of his home "primarily for the business." ORS 670.600(3)(a)(B).

The balance of Paragraph 20 provides:
"I agree that I shall not, during the term of this Agreement and for a period of one (1) year thereafter, directly or indirectly, divert, entice, knowingly call upon, sell or solicit, take away or move any customer of ACN or any ACN Provider, whether or not I originally procured or brought such customer to ACN (such activities are collectively referred to and included herein as 'solicitation'). All customers solicited by an IBO on behalf of ACN and ACN Providers are deemed to be customers of ACN or the ACN Provider and not of the IBO. I understand that such non solicitation prohibition shall be strictly enforced and that each ACN Provider shall be a third party beneficiary of this prohibition. Further, during the term of the Agreement and for a period of one (1) year thereafter, I may not enter into a direct marketing relationship with any ACN Provider. During the term of this Agreement and for a period of one (1) year thereafter, I may not solicit an ACN IBO, whether active, inactive, individual or entity, to participate in a network marketing program offered by any other company. Without limiting in any way ACN's right to pursue all rights and remedies available to it, violation of this covenant and condition will result in, but is not limited to, forfeiture of all rights in any IBO position and ACN Payments, including all current and future commissions, bonuses and payments of any kind."

ACN argues that that result will create an "impractical burden for workers and a regulatory nightmare for the state officials tasked with administering Oregon's employment laws," jeopardizing the future viability of the direct selling industry in Oregon. If that is true, then it is a policy issue that ACN can present to the legislature to address.